**THIS IS NOT A SOLICITATION OF VOTES ON THE PLAN. VOTES MAY NOT BE SOLICITED UNTIL THE BANKRUPTCY COURT HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

<div align="center">

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

</div>

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| ZUMOBI, INC., | § | Case No. 19- 12284(KG) |
| | § | |
| Debtor. | § | Chapter 11 |

<div align="center">

**DISCLOSURE STATEMENT FOR THE PLAN OF REORGANIZATION OF ZUMOBI, INC. DATED OCTOBER 28, 2019**

</div>

<div align="center">

MORRIS JAMES LLP
Jeffrey R. Waxman (No. 4159)
Eric J. Monzo (No. 5214)
Brya M. Keilson (No. 4643)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

*Proposed Counsel to the Debtor and Debtor in Possession*

</div>

11328289/2

## DISCLAIMERS

This Disclosure Statement provides information regarding the Plan of Reorganization of Zumobi, Inc. that the Debtor is seeking to have confirmed by the Bankruptcy Court. The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. Approval of this Disclosure Statement does not constitute a determination or recommendation by the Bankruptcy Court as to the fairness or the merits of the Plan.

This Disclosure Statement contains summaries of certain provisions of the Plan, certain statutory provisions, certain documents relating to the Plan, and certain financial information. Although the Debtor believes that these summaries are fair and accurate and provide adequate information with respect to the documents summarized, such summaries are qualified to the extent that they do not set forth the entire text of, or are inconsistent with, such documents.

Although the Debtor has made every effort to be accurate, the financial information contained herein has not been the subject of an audit or other review by an accounting firm. In the event of any conflict, inconsistency, or discrepancy between the terms and provisions in the Plan, this Disclosure Statement, the exhibits annexed to this Disclosure Statement, or the financial information incorporated herein or therein by reference, the Plan shall govern for all purposes. All holders of claims should read this Disclosure Statement and the Plan in their entirety before voting on the Plan.

The statements and financial information contained herein have been made as of the date hereof unless otherwise specified. Holders of claims and equity interests reviewing this Disclosure Statement should not infer at the time of such review that there have been no changes in the facts set forth herein. Although the Debtor has made an effort to disclose where changes in present circumstances could reasonably be expected to affect materially the recovery under the Plan, this Disclosure Statement is qualified to the extent certain events do occur.

IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, holders of claims and equity interests are hereby notified that: (a) any discussion of U.S. federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of claims or equity interests for the purpose of avoiding penalties that may be imposed on them under the Internal Revenue Code; (b) such discussion is written in connection with the promotion or marketing by the Plan proponents of the transactions or matters addressed herein; and (c) holders of claims and equity interests should seek advice based on their particular circumstances from an independent tax advisor.

This Disclosure Statement has been prepared in accordance with Bankruptcy Code Section 1125 and not necessarily in accordance with Federal or State securities laws or other non-bankruptcy law. This Disclosure Statement has not been approved or disapproved by the Securities and Exchange Commission (the "SEC") or any Federal, State, local or foreign regulatory agency, nor has the SEC or any other such agency passed upon the accuracy or

adequacy of the statements contained in this Disclosure Statement. Persons or entities holding or trading in, or otherwise purchasing, selling, or transferring, securities of or claims against the Debtor should evaluate this Disclosure Statement and the Plan in light of the purpose for which they were prepared.

The Debtor makes statements in this Disclosure Statement that are considered forward-looking statements under the Federal securities laws. Statements concerning these and other matters are not guarantees of the Debtor's future performance. Such forward-looking statements represent the Debtor's estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties, and other unknown factors that could impact the Debtor's restructuring plans or cause the actual results of the Debtor's business to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements that explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transaction described herein will be consummated. Creditors and other interested parties should see the section of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Reorganized Debtor.

## <u>TABLE OF CONTENTS</u>

**Page(s)**

I.      INTRODUCTION ............................................................................................... 1

    A.      Overview of the Plan ........................................................................ 1

        1.      General Structure of the Plan.................................................. 1

        2.      Material Terms of the Plan ..................................................... 2

        3.      Summary of Treatment of Claims and Equity Interests Under the Plan ...................................................................................... 4

    B.      Plan Voting Instructions and Procedures ............................................. 5

        1.      Voting Rights .......................................................................... 5

        2.      Solicitation Materials .............................................................. 5

        3.      Voting Instructions.................................................................. 6

        4.      Confirmation Hearing and Deadline for Objections to Confirmation ........................................................................... 8

II.     GENERAL INFORMATION ABOUT THE DEBTOR ................................... 9

    A.      Background ........................................................................................... 9

        1.      Secured Debt............................................................................ 9

        2.      Trade Debt ............................................................................. 10

        3.      Litigation............................................................................... 10

        4.      Equity Interests ..................................................................... 10

        5.      Tax Attributes ....................................................................... 11

    B.      Events Leading to the Filing of the Bankruptcy Case ......................... 9

    C.      Marketing Process............................................................................... 11

III.    THE DEBTOR'S BANKRUPTCY CASE..................................................... 11

    A.      Commencement of the Chapter 11 Case ............................................. 11

    B.      Postpetition Operations....................................................................... 11

    C.      Restructuring Support Agreement ....................................................... 12

    D.      The DIP Financing.............................................................................. 14

    E.      Schedules, Statements of Financial Affairs and Claims Bar Dates .................... 14

    F.      Additional Orders................................................................................ 14

IV.     SUMMARY OF THE CHAPTER 11 PLAN ................................................ 15

    A.      Treatment of Unclassified Claims ...................................................... 15

|   |   | 1. | Administrative Claims | 15 |
|   |   | 2. | Bar Date For Administrative Claims | 17 |
|   |   | 3. | Allowed Priority Tax Claims | 18 |
| B. |   |   | Classification and Treatment of Claims and Equity Interests | 18 |
|   |   | 1. | Class 1:  Priority Unsecured Non-Tax Claims | 19 |
|   |   | 2. | Class 2:  Convenience Claims | 19 |
|   |   | 3. | Class 3:  General Unsecured Claims | 19 |
|   |   | 4. | Class 4:  Noteholder Claim | 19 |
|   |   | 5. | Class 5:  Equity Interests | 19 |
| C. |   |   | Acceptance or Rejection of the Plan | 20 |
|   |   | 1. | Impaired Classes Entitled to Vote | 20 |
|   |   | 2. | Acceptance by Classes 2, 3  and 4 | 20 |
|   |   | 3. | Presumed Acceptances by Class 1 | 20 |
|   |   | 4. | Deemed Rejection by Class 5 | 20 |
| D. |   |   | Means for Implementation of the Plan | 20 |
|   |   | 1. | Continued Corporate Existence | 20 |
|   |   | 2. | Management and Board of Directors | 21 |
|   |   | 3. | Arrangements with the Distribution Trustee | 21 |
|   |   | 4. | The Closing | 21 |
|   |   | 5. | Tax Treatment of the Distribution Trust | 23 |
|   |   | 6. | Preservation of Rights of Action | 23 |
|   |   | 7. | Vesting of Property in Reorganized Debtor | 24 |
|   |   | 8. | Tax Exemption | 24 |
|   |   | 9. | No Successor Liability | 24 |
| E. |   |   | Treatment of Executory Contracts and Unexpired Leases | 25 |
|   |   | 1. | Assumption of Executory Contracts | 25 |
|   |   | 2. | Rejection of Executory Contracts | 25 |
|   |   | 3. | Procedures Related to Assumption of Executory Contracts | 26 |
|   |   | 4. | Rejection Claim Bar Date | 27 |
|   |   | 5. | Indemnification Obligations | 28 |
| F. |   |   | Provisions Governing Distributions of Property | 28 |
|   |   | 1. | Distributions Procedures Regarding Allowed Claims | 28 |
|   |   | 2. | Procedures Regarding Distributions from the Distribution Trust | 30 |

G.    Procedures for Resolution of Disputed Claims .................................................... 30

     1.    Right to Object to Claims ........................................................ 30

     2.    Deadline for Objecting to Claims ............................................ 31

     3.    Deadline for Responding to Claim Objections ........................ 31

     4.    Right to Request Estimation of Claims .................................... 31

H.    Injunctions, Releases, and Discharge ................................................................. 31

     1.    Discharge and Release ............................................................ 31

     2.    Discharge Injunction .............................................................. 32

     3.    Exculpation and Limitation of Liability ................................. 32

     4.    Releases by the Debtor ............................................................ 33

     5.    Releases by Third Parties ........................................................ 33

I.    Conditions to Confirmation and Effectiveness .................................................. 34

     1.    Conditions to Confirmation .................................................... 34

     2.    Conditions to Effectiveness .................................................... 35

J.    Modification, Revocation or Withdrawal of the Plan ......................................... 35

     1.    Defects, Omissions, and Amendments of the Plan ................. 35

     2.    Withdrawal of the Plan ........................................................... 35

K.    Retention of Jurisdiction ................................................................................... 36

     1.    Bankruptcy Court Jurisdiction ............................................... 36

     2.    Limitations on Jurisdiction ..................................................... 37

V.    POST-EFFECTIVE DATE OPERATIONAL/FINANCIAL INFORMATION ............. 37

VI.    RISK FACTORS ...................................................................................................... 38

   A.    Risks Related to Bankruptcy .............................................................................. 38

     1.    Parties May Object to the Plan's Classification of Claims and Equity Interests ....................................................................... 38

     2.    The Debtor May Not Be Able to Obtain Confirmation of the Plan ......... 38

     3.    The Conditions Precedent to the Effective Date of the Plan May Not Occur ................................................................... 39

     4.    Allowed Claims May Exceed Estimates ................................ 39

   B.    Risks Related to Financial Information .............................................................. 39

VII.    CONFIRMATION OF THE PLAN ........................................................................... 39

   A.    The Confirmation Hearing ................................................................................. 39

   B.    Requirements for Confirmation of the Plan ....................................................... 40

C.    Best Interests of Creditors / Liquidation Analysis ................................................ 41

D.    Feasibility ................................................................................................................ 41

E.    Acceptance by Impaired Classes ........................................................................... 42

F.    Confirmation Without Acceptance by All Impaired Classes ............................... 42

    1.    No Unfair Discrimination .......................................................................... 42

    2.    Fair and Equitable Test .............................................................................. 43

VIII.    TAX CONSEQUENCES OF THE PLAN ................................................................... 43

IX.    CERTAIN SECURITIES LAW MATTERS ................................................................ 43

A.    In General ................................................................................................................ 43

B.    Distribution Trust Related Matters ........................................................................ 43

    1.    Initial Issuance of Beneficial Interests ..................................................... 43

    2.    Resales ....................................................................................................... 44

    3.    Exchange Act Compliance ........................................................................ 44

    4.    Compliance if Required ............................................................................. 45

X.    RECOMMENDATION ................................................................................................. 46

## **EXHIBITS**

EXHIBIT A    Plan of Reorganization

EXHIBIT B    Liquidation Analysis

EXHIBIT C – Restructuring Support Agreement

<div style="border:1px solid black">

**THE DEBTOR HEREBY ADOPTS AND INCORPORATES EACH
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

</div>

## I.    **INTRODUCTION**

Zumobi, Inc. (the "Debtor") hereby submits this disclosure statement (the "Disclosure Statement") pursuant to sections 1125 and 1126(b) of Title 11 of the United States Code (the "Bankruptcy Code"), in connection with the solicitation of votes on the *Plan of Reorganization of Zumobi, Inc.,* dated October 28, 2019 (as amended, supplemented or otherwise modified from time to time pursuant to its terms, the "Plan"). A copy of the Plan is attached hereto as Exhibit A.[1]

The purpose of this Disclosure Statement is to enable Creditors whose Claims are Impaired under the Plan and who are entitled to vote to make an informed decision in exercising their right to accept or reject the Plan. This Disclosure Statement sets forth certain information regarding the Debtor's prepetition operating and financial history, its reasons for seeking protection under the Bankruptcy Code and the anticipated organization, operations, and financing of the Debtor upon its successful emergence from bankruptcy protection. This Disclosure Statement also describes certain terms and provisions of the Plan, certain effects of confirmation of the Plan, certain risk factors associated with the Plan, the business of the Debtor or Reorganized Debtor, and the securities that may be issued under the Plan, including the issuance of New Equity to ESW Capital, LLC ("ESW"), as the Plan Sponsor and the DIP Lender, and the manner in which Distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of Claims entitled to vote under the Plan must follow for their votes to be counted.

### A.    **Overview of the Plan**

#### 1.    **General Structure of the Plan**

The Plan provides for the reorganization of the Debtor by retiring, cancelling, extinguishing, and/or discharging the Debtor's existing Equity Interests and issuing New Equity in the Reorganized Debtor to the Plan Sponsor and, to the extent it exercises the Subscription Option, to the DIP Lender. In exchange, the Plan Sponsor has agreed to provide Consideration which will fund a trust (the "Distribution Trust") and will ultimately be distributed to holders of Allowed Claims in accordance with the priority scheme established by the Bankruptcy Code, or as otherwise agreed by Oak Investment Partners XII, L.P. ("Oak") and Hunt Ventures Fund I, L.P. ("Hunt" and together with Oak, the "Noteholders," as holders of a series of bridge notes, which eventually totaled $8,950,000, excluding interest, pursuant to the Restructuring Support Agreement (the "RSA") among the Noteholders, ESW, and the Debtor.  ESW is an entity unaffiliated with the Debtor. As agreed by the Noteholders under the RSA, holders of Allowed General Unsecured Claims will be paid the GUC Recovery. the Noteholders will receive the Noteholder Recovery, if any, up to the full amount of the Allowed Noteholder Claim.

To fund the Chapter 11 Case, the ESW Capital  has agreed to loan funds to the Debtor pursuant to the DIP Financing Order by the Bankruptcy Court. The Allowed DIP Lender Claim

---

[1]  Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between the summary herein and the Plan, the Plan shall govern.

will be satisfied through: (a) the exercise of the Subscription Option,[2] and (b) to the extent any amount of Allowed DIP Lender Claim remains after the DIP Lender exercises the Subscription Option, the remainder of its Allowed DIP Lender Claim shall be repaid in Cash funded and paid by the Plan Sponsor in addition to the Consideration on the Effective Date, or reduced on a dollar-for-dollar basis by agreement between the DIP Lender and the Plan Sponsor. For the avoidance of doubt, in no event will the full or partial exercise of the Subscription Option reduce the amount of the Consideration paid by Plan Sponsor.

The Consideration, subject to Section 6.4 of the Plan, will be used to satisfy Allowed Administrative Claims (including Ordinary Course Liabilities to the extent not paid prior to the Effective Date), Allowed Priority Tax Claims, and Allowed Priority Unsecured Non-Tax Claims, consistent with Bankruptcy Code section 1129. All of the foregoing Allowed Claims will be satisfied in full. Remaining Consideration will be used to fund the GUC Recovery and the Noteholder Recovery, if any.

Finally, the Plan provides that Equity Interests in the Debtor will be cancelled, released, and extinguished.

**THE DEBTOR BELIEVES THAT THE PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE TO THE ESTATE, IS IN THE BEST INTERESTS OF THE DEBTOR'S ESTATE AND ITS STAKEHOLDERS, AND WILL ENABLE THE DEBTOR TO SUCCESSFULLY REORGANIZE AND ACCOMPLISH THE OBJECTIVES OF CHAPTER 11.**

**FOR THESE REASONS, THE DEBTOR URGES HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN.**

### 2. Material Terms of the Plan

The following is an overview of certain material terms of the Plan:

- The Debtor will be reorganized pursuant to the Plan and continue in operation following the Effective Date. On the Effective Date, 1,000 shares of New Equity of the Reorganized Debtor shall be issued. To the extent the DIP Lender exercises the Subscription Option, the DIP Lender will receive New Equity of the Reorganized Debtor. In exchange for payment of the Consideration of $750,000, plus up to another $150,000[3], the Plan Sponsor will receive the remainder of the New Equity

---

[2] The Plan Sponsor reserves the right to modify the Subscription Option, provided that (i) no such modification shall adversely impact the Plan treatment of other creditors, and (ii) such modification is approved by the DIP Lender.

[3] The Plan Sponsor has agreed to leave behind the Debtor's accounts receivable and cash as reflected on the Debtor's balance sheet ("Cash-on-Hand") as of the Plan Effective Date for creditors, up to a maximum of $150,000. To the extent that Cash-on-Hand as of the Effective Date totals less than $150,000, the Plan Sponsor will fund additional cash under the Plan such that the total of Cash-on-Hand plus additional funded cash will equal $150,000, *provided* that at least this amount of cash remains available under the DIP Note as of the Effective Date. Example 1: if the Debtor has $50,000 in Cash-on-Hand as of the Effective Date, and $200,000 remains undrawn under the DIP Note as of the Effective Date, the Plan Sponsor will fund $100,000 in additional cash under the Plan (such that Cash-on-Hand

11328289/2

of the Reorganized Debtor. The aggregate amount of the New Equity received by the Plan Sponsor and the DIP Lender will equal 100% of the New Equity of the Reorganized Debtor.

- Except with regards to the Ordinary Course Liabilities, the treatment of which is described below, it is anticipated that Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Priority Unsecured Non-Tax Claims will be paid from the Consideration (subject to Section 6.4 of the Plan) or otherwise satisfied in full, as required by the Bankruptcy Code, unless otherwise agreed to by the Debtor, the Plan Sponsor and the holders of such Claims.

- On the Effective Date, the DIP Lender Claim will be Allowed in full. The Allowed DIP Lender Claim shall be satisfied as follows pursuant to the Subscription Option. The DIP Lender shall have the option to convert a portion of the outstanding Allowed DIP Lender Claim into shares of New Equity at a rate of 10% of the Allowed DIP Lender Claim for 60 shares of New Equity, up to a maximum of 100% of the Allowed DIP Lender Claim for 600 shares out of the total 1000 shares of New Equity. Further, to the extent any amount of Allowed DIP Lender Claim remains after the DIP Lender exercises the Subscription Option, the remainder of its Allowed DIP Lender Claim shall be repaid in Cash funded and paid by the Plan Sponsor in addition to the Consideration on the Effective Date, or reduced on a dollar-for-dollar basis by agreement between the DIP Lender and the Plan Sponsor. For the avoidance of doubt, in no event will the full or partial exercise of the Subscription Option reduce the amount of the Consideration paid by Plan Sponsor. In any scenario, as of the Effective Date, ESW will own 100% of the New Equity of the Reorganized Debtor, in its capacity as the Plan Sponsor, and possibly in its capacity as the DIP Lender.

- The Debtor shall continue to pay each Ordinary Course Liability, accrued prior to the Effective Date, pursuant to the payment terms and conditions of the particular transaction giving rise to the Ordinary Course Liability, and the Approved Budget.

- Each holder of an Allowed Convenience Claim will receive a guaranteed recovery of thirty percent (30%) on account of and in full and complete settlement, release and discharge of, and in exchange for its Allowed Convenience Claim.

- Each holder of an Allowed General Unsecured Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for its Allowed General Unsecured Claim, its Pro Rata Share of the GUC Recovery.

- The Noteholders shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for their Allowed Noteholder Claim, the

---

plus funded cash equals $150,000). Example 2: if the Debtor has $50,000 in Cash-on-Hand as of the Effective Date, and $20,000 remains undrawn under the DIP Note as of the Effective Date, the Plan Sponsor will fund $20,000 in additional cash under the Plan (such that Cash-on-Hand plus funded cash equals $70,000). Example 3: if the Debtor has 200,000 in Cash-on-Hand as of the Effective Date, then it will be permitted to keep $150,000 of that amount (from accounts receivable before cash), and it will not receive any additional cash from the Plan Sponsor.

3

Noteholder Recovery.

- All existing Equity Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtor or the Reorganized Debtor. Holders of Equity Interests will not receive any Distribution on account of their Equity Interest.

### 3.    Summary of Treatment of Claims and Equity Interests Under the Plan

The table below summarizes the classification and treatment of the Claims and Equity Interests under the Plan.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**

| Class | Claim or Equity Interest | Summary of Treatment | Estimated Aggregate Amount of Claims[4] | Projected Recovery Under Plan |
|-------|--------------------------|----------------------|------------------------------------------|-------------------------------|
| 1 | Priority Unsecured Non-Tax Claims | Unimpaired; Deemed to Accept Plan | $15,000 | 100% |
| 2 | Convenience Claims | Impaired; Entitled to Vote on Plan | $198,644 | 30% |
| 3 | General Unsecured Claims | Impaired; Entitled to Vote on Plan | $2,047,661 | 25-33%% |
| 4 | Noteholder Claim | Impaired; Entitled to Vote on Plan | $10,929,337 | Share pro rata distribution to with Class 3 claims for all distributions over 30% |
| 5 | Equity Interests | Impaired; Deemed to Reject | N/A | 0% |

**THE DEBTOR BELIEVES THAT THE PLAN PROVIDES THE BEST RECOVERIES POSSIBLE FOR HOLDERS OF CLAIMS AND THUS STRONGLY**

---

[4] Estimated aggregate amount of claims in each class as well as projected recoveries for each class are based solely on the Debtor's understanding of the universe of the claims in each Class. However, the Governmental Unit Bar Date has not yet passed and the actual amount of claims and projected recoveries could vary significantly based upon the final pool of filed claims and any reconciliation thereof. Nothing herein shall be construed to be an admission by the Debtor as to the extent, priority or validity of any claim.

**RECOMMENDS THAT YOU VOTE TO ACCEPT THE PLAN.**

### B. Plan Voting Instructions and Procedures

#### 1. Voting Rights

Under the Bankruptcy Code, only Classes of Claims that are "Impaired" and that are not deemed as a matter of law to have rejected a plan of reorganization under Bankruptcy Code section 1126 are entitled to vote to accept or reject the Plan. Any Class that is "Unimpaired" is not entitled to vote to accept or reject a plan of reorganization and is conclusively presumed to have accepted the Plan. As set forth in Bankruptcy Code section 1124, a Class is "Impaired" if the legal, equitable, or contractual rights attaching to the claims or equity interests of that Class are modified or altered.

Pursuant to the Plan, Claims in Class 1are Unimpaired by the Plan, and such holders are deemed to have accepted the Plan and are therefore not entitled to vote on the Plan.

Pursuant to the Plan, Claims in Classes 2 (Convenience Claims), 3 (General Unsecured Claims) and 4 (Noteholder Claim) are Impaired by, and entitled to receive a Distribution under the Plan, and only the holders of Claims in these Classes are entitled to vote to accept or reject the Plan. Whether a holder of a Claim in Classes 2, 3 and 4 may vote to accept or reject the Plan will also depend on whether the holder held such Claim as of the Voting Record Date.

Pursuant to the Plan, Holders of Equity Interests in Class 5 will not receive any Distribution and are deemed to have rejected the Plan and are therefore not entitled to vote on the Plan.

#### 2. Solicitation Materials

Morris James, the Debtor's proposed counsel, has agreed to serve as the voting agent (the "Voting Agent"), subject to the approval of the Bankruptcy Court, to process and tabulate Ballots for each Class entitled to vote on the Plan and to generally oversee the voting process. The following materials shall constitute the solicitation package (the "Solicitation Package"):

- This Disclosure Statement, including the Plan and all other Exhibits annexed thereto;

- The Bankruptcy Court order approving this Disclosure Statement on a conditional basis, subject to final approval in connection with the Confirmation Hearing (the "Disclosure Statement Order");

- The notice of, among other things, (i) the date, time, and place of the hearing to consider Confirmation of the Plan and related matters and (ii) the deadline for filing objections to Confirmation of the Plan (the "Confirmation Hearing Notice");

- One or more Ballots, as applicable, to be used in voting to accept or to reject the Plan and applicable instructions with respect thereto (the "Voting Instructions");

- A pre-addressed return envelope; and

- Such other materials as the Bankruptcy Court may direct or approve.

The Debtor, through the Voting Agent, will distribute the Solicitation Package in accordance with the Disclosure Statement Order.

If you are the holder of a Claim and believe that you are entitled to vote on the Plan, but you did not receive a Ballot or your Ballot is damaged or illegible, or if you have any questions concerning voting procedures, you should contact the Voting Agent by writing to Zumobi, Inc., Ballot Processing, c/o Eric Monzo or by telephone at 302-888-5848 or via email at EMonzo@morrisjames.com. If the reason that you did not receive a Ballot is because your Claim is subject to a pending claim objection or otherwise has been designated as a Disputed Claim and you wish to vote on the Plan, you must file a motion pursuant to Bankruptcy Rule 3018 with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes by [_____], or you will not be entitled to vote to accept or reject the Plan.

**THE DEBTOR, THE DISTRIBUTION TRUSTEE, AND THE REORGANIZED DEBTOR, AS AND IF APPLICABLE, RESERVE THE RIGHT THROUGH THE CLAIM OBJECTION PROCESS, TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM OR EQUITY INTEREST FOR DISTRIBUTION PURPOSES.**

### 3.    Voting Instructions

All votes to accept or reject the Plan must be cast by using the Ballots enclosed with the Solicitation Packages. No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed the Voting Record Date for the determination of the holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan. The Voting Record Date and all of the Debtor's solicitation and voting procedures shall apply to all of the Debtor's Creditors and other parties in interest.

After carefully reviewing the Plan, this Disclosure Statement, and the detailed instructions accompanying your Ballot, you are asked to indicate your acceptance or rejection of the Plan by voting in favor of or against the Plan on the accompanying Ballot.

**The deadline to vote on the Plan is [DATE] (Eastern Time) (the "Voting Deadline")**. For your vote to be counted, your Ballot must be properly completed in accordance with the Voting Instructions on the Ballot, and **received** no later than the Voting Deadline at the address set forth below:

> Morris James, LLP
> 500 Delaware Avenue, Suite 1500
> Wilmington, DE 19801
> Attention: Jeffrey R. Waxman, Balloting Agent

Only the Holders of Claims in Class 2, 3 and 4 as of the Voting Record Date are entitled to vote to accept or reject the Plan, and they may do so by completing the appropriate Ballots and

returning them in the envelope provided by the Voting Agent so as to be actually received by the Voting Agent by the Voting Deadline or by voting on the Voting Agent's website by the Voting Deadline. Each holder of a Claim must vote its entire Claim within a particular Class either to accept or reject the Plan and may not split such votes. If multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last timely received, properly executed Ballot will be deemed to reflect that voter's intent and will supersede and revoke any prior Ballot. The Ballots will clearly indicate the appropriate return address. It is important to follow the specific instructions provided on each Ballot.

Unless otherwise provided in the Voting Instructions accompanying the Ballots or otherwise ordered by the Bankruptcy Court, the following Ballots will not be counted in determining whether the Plan has been accepted or rejected:

- Any Ballot that fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection, of the Plan;

- Any Ballot received after the Voting Deadline, except if the Debtor has granted an extension of the Voting Deadline with respect to such Ballot, or by order of the Bankruptcy Court;

- Any Ballot containing a vote that the Bankruptcy Court determines was not solicited or procured in good faith or in accordance with the applicable provisions of the Bankruptcy Code;

- Any Ballot that is illegible or contains insufficient information to permit the identification of the Claim;

- Any Ballot cast by a Person or Entity that does not hold an Allowed Claim in a voting Class; and

- Any unsigned Ballot or Ballot without an original signature (or in the case of electronic balloting, a proper and verified electronic signature).

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot that bears the latest date will be counted for purposes of determining whether the requisite acceptances have been received. Any party who has delivered a properly completed Ballot for the acceptance or rejection of the Plan that wishes to withdraw such acceptance or rejection rather than changing its vote may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Voting Agent at any time prior to the Voting Deadline. To be valid, a notice of withdrawal must: (i) contain the description of the Claims to which it relates and, in the case of Claims, the aggregate principal amount represented by such Claims; (ii) be signed by the withdrawing party in substantially the same manner as the Ballot being withdrawn; (iii) contain a certification that the withdrawing party owns the Claims and possesses the right to withdraw the vote sought to be withdrawn; and (iv) be actually received by the Voting Agent prior to the Voting Deadline.

7

The Debtor, in its sole discretion, subject to contrary order of the Court, may waive any defect in any Ballot at any time, either before or after the close of voting, and without notice. Except as otherwise provided herein, the Debtor may, in its sole discretion, reject such defective Ballot as invalid and, therefore, not count it in connection with confirmation of the Plan.

**ALL BALLOTS ARE ACCOMPANIED BY VOTING INSTRUCTIONS. IT IS IMPORTANT THAT THE HOLDER OF A CLAIM IN THE CLASSES ENTITLED TO VOTE FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED WITH EACH BALLOT.**

If you have any questions about (a) the procedure for voting your Claim, (b) the Solicitation Package that you have received, or (c) the amount of your Claim, or if you wish to obtain, at your own expense (unless otherwise specifically required by Bankruptcy Rule 3017(d)), an additional copy of the Plan, this Disclosure Statement, or any appendices or Exhibits to such documents, please contact the Voting Agent at the address specified above. Copies of the Plan, Disclosure Statement, and other documents filed in this Chapter 11 Case may be obtained free of charge by contacting Eric Monzo at Morris James LLP via electronic mail at EMonzo@morrisjames.com or by telephone at 302-888-5848.  Documents filed in this case may also be examined between the hours of 8:00 a.m. and 4:00 p.m., prevailing Eastern Time, Monday through Friday, at the Office of the Clerk of the Bankruptcy Court, 824 North Market Street, 3rd Floor, Wilmington, Delaware 19801.

The Voting Agent will process and tabulate Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") as soon as reasonably practicable following the Voting Deadline. The Voting Report will, among other things, describe every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity, including, but not limited to, those Ballots that are late, illegible (in whole or in material part), unidentifiable, lacking signatures, lacking necessary information, or damaged.

**THE DEBTOR URGES HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE TO TIMELY RETURN THEIR BALLOTS AND TO VOTE TO ACCEPT THE PLAN BY THE VOTING DEADLINE.**

### 4.    Confirmation Hearing and Deadline for Objections to Confirmation

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Bankruptcy Code section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

**The Bankruptcy Court has scheduled the Confirmation Hearing to commence on [DATE at _:00 _.m.] (Eastern Time)**, before the Honorable Kevin Gross, United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. The Confirmation Hearing Notice, which sets forth the time and date of the Confirmation Hearing, has been included along with this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

8

**Objections to Confirmation of the Plan must be filed and served on the Debtor, the Plan Sponsor and certain other entities, all in accordance with the Confirmation Hearing Notice by no later than [DATE at _:00 _.m.]. (Eastern Time).** Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, which is attached to this Disclosure Statement, they may not be considered by the Bankruptcy Court.

## II.    GENERAL INFORMATION ABOUT THE DEBTOR

### A.    Background

Zumobi is a mobile technology company that partners with multiple brands to promote native content marketing solutions on smartphones, tablets, and other devices in order to address the challenge of providing a more streamlined solution for publishing and consuming content on mobile devices.  Founded in September 2006, the company's original product was a mobile browser-based service that aimed to make surfing the web on mobile devices easier using widgets. The Zumobi team has continually innovated at the intersection of mobile user interface (UI) and content, first as an early pioneer in mobile platform development, then as a premiere mobile app publishing partner with leading media organizations and now as an innovator in mobile content marketing for top-tier marketers.

Over the years, Zumobi developed core business relationships with many of the key players in the mobile media ecosystem, including major media companies and advertisers.  After several years of research and development investment in technical infrastructure, Zumobi achieved profitability in 2015 and was well on its way to building a sustainable mobile media business.

### B.    Events Leading to the Filing of the Bankruptcy Case

Near the end of 2015, Zumobi lost its primary distribution partner after that company's mobile advertising business was sold to a competitor.  This was a financial blow to Zumobi, as that distribution partnership accounted for over 60% of annual revenue that could not be replaced. Zumobi retooled and attempted to rebuild itself by investing its research and development in a new product called Microzines in early 2016.  Microzines are content marketing vehicles that enable marketers to deliver their branded content and social media on mobile devices.  This new product gained traction and became the primary driver of new customers between late 2016 through 2018. However, in October 2018, Zumobi was notified that the contract of a major partner, Autograph Inc., had been terminated by its only customer.  This directly impacted Zumobi as it was a subcontractor of Autograph, and Zumobi lost this entire revenue stream going into 2019.  Zumobi's attempts to leverage that business to others in the industry lost momentum with the loss of the Autograph contract.

Zumobi had invested significant resources in developing this business, in anticipation of it being a major source of revenue in 2019, and when Autograph's contract was abruptly terminated, Zumobi suffered immediate and unrecoverable operating losses.  At the same time, Zumobi's profitability faced headwinds as the ad tech industry was consolidating around the major players in the market, including Google and Facebook, making it even harder for smaller companies like

Zumobi to compete.  These factors combined to create such a huge negative financial impact that the company could no longer operate independently as a going concern.

At the end of 2015, Zumobi had 30 employees.  Following the economic issues set forth above, Zumobi attempted to right-size itself.  As of December 2018, Zumobi had 13 employees.  In December 2018, Zumobi assigned its headquarters to a third party, and leased back 50% of the space, effective August 15, 2019.  Additionally, Zumobi terminated the lease of its office space in New York, effective Aug 30, 2019.  As 2019 progressed, Zumobi continued to reduce its workforce and by June 2019, Zumobi had seven (7) full time employees, plus two (2) part-time accounting staff.  Zumobi's operations have been limited since August 2019.  As of the Petition Date, Zumobi has two consultants (one software engineer and one salesperson).

### C.    The Debtor's Obligations as of the Petition Date.

#### 1.    Secured Debt

In February 2011, Zumobi entered into a Loan and Security Agreement, as subsequently amended, with Silicon Valley Bank ("SVB"), in which SVB provided a term loan and revolving line of credit secured by all or substantially all of Zumobi's assets in the amount of $1.5 million. On or about May 12, 2015, any and all amounts owed to SVB were paid so that the SVB released all interests in the Debtor's property.  As a result of payment of the amounts owed to SVB and other parties previously holding a security interest in Zumobi's assets, the Debtor has no secured debt as of the Petition Date.

#### 2.    Bridge Notes

In or about June 2019, the Noteholders provided the Debtor with a series of bridge notes (the "Bridge Notes"), which eventually totaled $8,950,000, excluding interest.  After exhausting the final $400,000 draw on the Bridge Notes in April 2019, Zumobi was notified by the Noteholders that the Debtor had depleted all funds available under the Bridge Notes.  The Debtor believes that as of the Petition Date, the Debtor's obligation to the Noteholders under the Bridge Note totaled approximately $10,929,337.

#### 3.    Unsecured Debt

Historically, the Debtor remained relatively current with its trade creditors.  As of the Petition Date, the Debtor was obligated to its unsecured creditors in an aggregate amount of approximately $2,246,000.00.

#### 4.    Equity Interests

As of the Petition Date, the Debtor had two classes of outstanding stock owned by approximately 29 different shareholders.  Additionally, the Debtor had issued additional options comitteed for issuance and had outstanding Series A warrants.  As of the Petition Date, the Noteholders, Hunt Ventures Fund I, L.P  and Oak Investment Partners XII Limited Partnership, were among the two largest shareholders, holding 9,234,596 and 69,610,450 of Series A shares, respectively.  Further, as of the Petition Date, the Noteholders control three seats on the five

member Zumobi board of directors. A complete list of the equity holders and their shares is attached to the Debtor's bankruptcy petition.

### 5. Tax Attributes

As of the Petition Date, the Debtor has approximately [$52,280,250] in net operating losses.

## D. Marketing Process

In light of the uncertainty within the market and its internal issues, in March 2018, Zumobi engaged Inverness Advisors ("Inverness") to market the company, particularly focused on larger organizations with more resources to invest in building the business. Interested parties were invited to submit letters of intent (a "LOI") to purchase the Debtor or substantially all of the Debtor's assets. The marketing process included the development, in conjunction with Zumobi's management team, of a marketing presentation for potential candidates. Inverness assisted the Debtor in identifying and evaluating candidates for a potential transaction. The Debtor, with the assistance of Inverness, prepared and implemented a marketing plan, and distributed a presentation to interested parties.

During this process, through the efforts of Inverness and members of Zumobi's board of directors and executive team, Zumobi contacted more than seventy (70) companies, including both strategic and financial potential purchasers, of which the company met with approximately twenty (20) potential acquirers. After nearly two years of seeking an acquisition, ESW Capital LLC ("ESW" or the "Plan Sponsor") was the only party to submit an offer, and on August 26, 2019, ESW Capital submitted an LOI. After receiving ESW Capital's LOI, Zumobi evaluated its restructuring alternatives and determined in its business judgment to proceed with a transaction with ESW Capital, subject to agreement of a proposed transaction. Zumobi has since negotiated at arms-length an agreement on a restructuring transaction with ESW Capital that addresses Zumobi's capital structure challenges, as memorialized in the RSA (defined below), including providing proposed financing to the Debtor during the Chapter 11 case.

## III. THE DEBTOR'S BANKRUPTCY CASE

### A. Commencement of the Chapter 11 Case

On October 25, 2019 (the "Petition Date"), the Debtor commenced a voluntary case under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware. The Debtor believes that, based upon its prepetition obligations, it is a small business debtor, as that term is defined by Section 101(51D) of the Bankruptcy Code.

### B. Postpetition Operations

As noted above, since the end of 2015, when it had 30 employees, Zumobi has significantly reduced the number of its employees and consultants. As of December 2018, Zumobi had 13 employees, and by June 2019, Zumobi had seven (7) full time employees, plus two (2) part-time accounting staff. Zumobi's operations have been limited since August 2019. As of the Petition Date, Zumobi has two consultants (one software engineer and one salesperson).

11

### C. Restructuring Support Agreement

After extensive marketing, the Debtor, the Noteholders and the Plan Sponsor negotiated the terms of the Restructing Support Agreement (the "RSA"). Among other things, the RSA provides:[5]

- ESW will contribute (i) $750,000 in cash, plus up to another $150,000[6]

- On and after the date that the Bankruptcy Court enters an order pursuant to Bankruptcy Code sections 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1), approving post-petition financing (the "DIP Financing"), ESW Capital, in its capacity as DIP Lender, will fund an aggregate amount of up to $500,000, of which up to $185,000 may be advanced on an interim basis to the extent set forth in an agreed upon budget, subject to the approval of the DIP Lender in its sole discretion.

- Any unused funds under the DIP Financing as of the Effective Date of the Plan shall be returned to ESW Capital. The Budget shall include line items for the professional fees of the Debtor.

- All amounts outstanding under the DIP Financing shall be repaid immediately upon the occurrence of the Termination Date as defined in the DIP Order.

- ESW may terminate the Restructuring Support Agreement and its commitment to act as Plan Sponsor at any time after the occurrence, and during the continuation of certain events, including not meeting certain milestones, or allowing any non-expired or non-abandoned U.S. or non-U.S. patents or patent applications assigned to the Debtor to be abandoned, failing to secure postpetition financing from any party other than ESW Capital, or the Bankruptcy Court's approval or confirmation of an Alternative Transaction (as that term is defined in the RSA).

---

[5]   The following is a brief summary of the RSA, and the Debtor strongly suggests that creditors and parties of interest receiving this Disclosure Statement review the RSA, a copy of which is attached hereto as Exhibit C.

[6]   The Plan Sponsor has agreed to leave behind the Debtor's accounts receivable and cash as reflected on the Debtor's balance sheet ("**Cash-on-Hand**") as of the Plan Effective Date for creditors, up to a maximum of $150,000. To the extent that Cash-on-Hand as of the Effective Date totals less than $150,000, the Plan Sponsor will fund additional cash under the Plan such that the total of Cash-on-Hand plus additional funded cash will equal $150,000, *provided* that at least this amount of cash remains available under the DIP Note as of the Effective Date. Example 1: if the Debtor has $50,000 in Cash-on-Hand as of the Effective Date, and $200,000 remains undrawn under the DIP Note as of the Effective Date, the Plan Sponsor will fund $100,000 in additional cash under the Plan (such that Cash-on-Hand plus funded cash equals $150,000). Example 2: if the Debtor has $50,000 in Cash-on-Hand as of the Effective Date, and $20,000 remains undrawn under the DIP Note as of the Effective Date, the Plan Sponsor will fund $20,000 in additional cash under the Plan (such that Cash-on-Hand plus funded cash equals $70,000). Example 3: if the Debtor has 200,000 in Cash-on-Hand as of the Effective Date, then it will be permitted to keep $150,000 of that amount (from accounts receivable before cash), and it will not receive any additional cash from the Plan Sponsor.

Further, the RSA provides for the treatment of certain claims or interests under the Plan, including:

- Payment of all allowed Administrative Claims, including all professional fees of the Debtor, subject to the Budget, in full in cash on the Effective Date of the Plan or as otherwise provided in the Bankruptcy Code or approved by the Bankruptcy Court, except to the extent that a holder of such claims agrees to different treatment, and the holders of Priority Tax Claims and Priority Unsecured Non-Tax Claims shall be paid in full.

- Holders of allowed Convenience Claims shall receive a guaranteed recovery of thirty percent (30%) on account of and in full and complete settlement, release and discharge of, and in exchange for their allowed Convenience Claims.

- Holders of allowed General Unsecured Claims shall receive their pro rata share of a recovery of up to thirty percent (30%) on account of all allowed General Unsecured Claims, after which holders of allowed General Unsecured Claims shall share in any remaining proceeds of the Consideration on a pro rata basis with holders of Allowed Noteholder Claim (as defined in the Plan).

- Holders of the Allowed Noteholder Claim shall receive, after a recovery of 30% to holders of allowed General Unsecured Claims, a recovery (if any) on a pro rata basis with holders of General Unsecured Claims from any remaining Consideration.

- Any and all prepetition equity interests in the Debtor arising from any form of equity securities, as defined in section 101(16) of the Bankruptcy Code, including, without limitation, any prepetition common or preferred stock or member interests issued and outstanding, and all options, warrants, and other rights relating thereto, shall be retired, cancelled, extinguished, and/or discharged on the Effective Date of the Plan in accordance with the terms of the Plan.

- On the Effective Date of the Plan, 1,000 shares of new equity interests in the reorganized Debtor (the "New Equity"), constituting the entirety of the reorganized Debtor's equity interests, shall be issued to the Plan Sponsor, subject to the Subscription Option.  The New Equity shall be free and clear of all liens, claims, rights, interests, security interests, and encumbrances of any kind (except those, if any, that are expressly approved in writing by ESW in its sole and absolute discretion) as provided in the Plan.

- On the Effective Date of the Plan, the DIP Lender shall have the option to convert a portion of the Allowed DIP Lender Claim into shares of New Equity at a rate of 10% of the Allowed DIP Lender Claim for 60 shares of New Equity, up to a maximum of 100% of the Allowed DIP Lender Claim for 600 shares out of the total 1000 shares of New Equity (the "Subscription Option").  For the avoidance of doubt, in no event will the Subscription Option reduce the amount of the Plan Consideration paid by Plan Sponsor.

The RSA is the basis for the treatment of Allowed Claims under the Plan.

On the Petition Date, the Debtor filed a motion with the Bankruptcy Court seeking entry of an order authorizing the Debtor to assume the RSA [Docket No. ___] (the "RSA Motion"), which is scheduled to be heard by the Bankruptcy Court on November __, 2019

13

D.        **Debtor-in-Possession Financing**

The Debtor required that debtor-in-possession financing to fund operations and restructuring costs in this Chapter 11 Case.  On the Petition Date, the Debtor filed its Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c)(1), 364(c)(1), 364(c)(2), 364(e) and 507 (I) Authorizing the Debtor to (A) Obtain Postpetition Secured Financing from ESW Capital, LLC; and (B) Pay Certain Related Fees and Charges; and (II) Scheduling A Final Hearing (the "DIP Motion") [Docket No. ____]. By and through the DIP Motion, the Debtor sought approval of up to $500,000 in postpetition financing, including up to $260,000 on an interim basis. An order approving the DIP Motion on an interim basis was entered by the Court on October __, 2019 (the "DIP Order") [Docket No. ____].  A hearing to consider the DIP Motion is scheduled for November _____, 2019.

E.        **Schedules, Statements of Financial Affairs and Claims Bar Dates**

As of the date of this filing, the Debtor has not yet filed with the Bankruptcy Court its schedules of assets and liabilities ("Schedules")  and statement of financial affairs ("SoFAs") The Debtor anticipates filing its Schedules and SoFAs on or prior to November __, 2019.

On October __, 2019, the Debtor filed a motion seeking Bankruptcy Court approval of a general deadline for filing proofs of claim in the Chapter 11 Case of the later of (i) [DATE, 2019, and (ii) thirty days after the filing of the Schedules and SoFAs, and a governmental deadline for filing proofs of claim in the Chapter 11 Case of [DATE, 2020].

F.        **Additional Motions**

On or since the Petition Date, the Debtor filed a number of motions and applications to retain professionals, to streamline the administration of the Chapter 11 Case, and to obtain other relief in the best interest of the Debtor.

●        Motion for Interim and Final Orders (I) Authorizing Debtor to (A) Continue Use of Existing Cash Management Procedures and (B) Maintain Existing Bank Accounts and Business Forms and (II) Granting Interim Suspension of Section 345(b) Requirements [Docket No. 3] (the "Cash Management Motion").  On October __, 2019, the Court approved the Cash Management Motion on an interim basis [Docket No. __].  A final hearing consider the Cash Management Motion is scheduled for _____, 2019.

●        Motion for Interim and Final Orders Pursuant to Sections 105(a), 363(b), 363(c), 507(a), 1107(a) and 1108 of the Bankruptcy Code and Fed. R. Bankr. P. 6003 and 6004 Authorizing the Debtor to (A) Pay Certain Compensation, (B) Reimbursing Expenses Incurred by the Debtors Consultants and Contractors, and (C) Authorizing the Debtors Bank to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Relating to the Foregoing [Docket No. 4] (the "Employee Wage Motion").  On October __, 2019, the Court approved the Employee Wage Motion on an interim basis [Docket No. __].  A final hearing consider the Employee Wage Motion is scheduled for _____, 2019.

14

● Motion for Entry of an Order Authorizing the Debtor to Continue and Renew Its Insurance Policies and Honor All Obligations in Respect Thereof [Docket No. 5]. On October __, 2019, the Court approved the Employee Wage Motion on an interim basis [Docket No. __].

## IV.    SUMMARY OF THE CHAPTER 11 PLAN

This section provides a summary of the structure and means for implementation of the Plan and the classification and treatment of Claims and Equity Interests under the Plan and is qualified in its entirety by reference to the Plan (as well as the Exhibits thereto and definitions therein).

The statements contained in this Disclosure Statement do not purport to be precise or complete statements of all the terms and provisions of the Plan or documents referred to therein, and reference is made to the Plan and to such documents for the full and complete statement of such terms and provisions.

The Plan itself and the documents referred to therein control the actual treatment of Claims against and Equity Interests in the Debtor under the Plan and will, upon the occurrence of the Effective Date, be binding upon all holders of Claims against and Equity Interests in the Debtor, the Debtor's estate, the Reorganized Debtor, all parties receiving property under the Plan, and other parties in interest. In the event of any conflict, inconsistency, or discrepancy between this Disclosure Statement and the Plan, the Plan Supplement, and/or any other operative document, the terms of the Plan, Plan Supplement, and/or such other operative document, as applicable, shall govern and control; provided that, in any event, the terms of the Plan shall govern and control over all other related documents.

### A.    Treatment of Unclassified Claims

In accordance with Bankruptcy Code section 1123(a)(1), Administrative Claims (including Professional Compensation Claims and Ordinary Course Liabilities) and Priority Tax Claims have not been classified and the respective treatment of such unclassified Claims is set forth in Article IV of the Plan.

### 1.    Administrative Claims

a. General. Except with regards to the Ordinary Course Liabilities (the treatment of which is described in Section 4.3 of the Plan), subject to the bar date provisions in the Plan, unless otherwise agreed to by the parties, each holder of an Allowed Administrative Claim shall receive, from the Consideration (subject to Section 6.4 of the Plan), Cash equal to the unpaid portion of such Allowed Administrative Claim within ten (10) days after the later of (a) the Effective Date, (b) the Allowance Date, or (c) such other date as is mutually agreed upon by the Debtor, the Plan Sponsor and the holder of such Claim.

b. Ordinary Course Liabilities. All Ordinary Course Liabilities are deemed to be Allowed Claims to the extent set forth in the Approved Budget. Except as set forth in Section 4.3(a) of the Plan, holders of Administrative Claims on account of Ordinary Course Liabilities are

15

not required to file or serve any request for payment of the Ordinary Course Liability. The Debtor shall continue to pay each Ordinary Course Liability accrued prior to the Effective Date, pursuant to the payment terms and conditions of the particular transaction giving rise to the Ordinary Course Liability, and the Approved Budget.  To the extent that a holder of an Administrative Claim, on account of Ordinary Course Liability which accrued prior to the Effective Date, did not submit an invoice for the Ordinary Course Liability to the Debtor prior to the Effective Date, the holder must submit the invoice to the Distribution Trustee in the ordinary course of business pursuant to the terms and conditions of the particular transaction giving rise to the Ordinary Course Liability. The Distribution Trustee shall remit payment on the Ordinary Course Liability within fifteen (15) days of receipt of the invoice.

c.   <u>Allowed DIP Lender Claim.</u> The DIP Lender Claim is Allowed in full. Pursuant to the Subscription Option, the DIP Lender shall have the option, on account of being the holder of the Allowed DIP Lender Claim, to convert a portion of the outstanding Allowed DIP Lender Claim into shares of New Equity at a rate of 10% of the Allowed DIP Lender Claim for 60 shares of New Equity, up to a maximum of 100% of the Allowed DIP Lender Claim for 600 shares out of the total 1000 shares of New Equity.[7] To the extent any amount of Allowed DIP Lender Claim remains after the DIP Lender exercises the Subscription Option, the remainder of its Allowed DIP Lender Claim shall be repaid in Cash funded and paid by the Plan Sponsor in addition to the Consideration on the Effective Date, or reduced on a dollar-for-dollar basis by agreement between the DIP Lender and the Plan Sponsor. For the avoidance of doubt, in no event will the full or partial exercise of the Subscription Option reduce the amount of the Consideration paid by Plan Sponsor. On the Effective Date, all liens and interests granted in exchange for or in connection with the DIP Note and/or under the DIP Order shall be deemed discharged, cancelled, and released and shall be of no further force and effect.

d.   <u>Payment of Statutory Fees.</u> All fees payable pursuant to 28 U.S.C. § 1930 shall be paid in Cash through the DIP Financing, up to the amount set forth in the Approved Budget, and otherwise with the Consideration (subject to Section 6.4 of the Plan) equal to the amount of such Administrative Claim when due or no later than the Effective Date. Postpetition U.S. Trustee fees and post-confirmation reports shall be paid and filed as required by 28 U.S.C. § 1930 until the Chapter 11 Case is closed. After confirmation, the Distribution Trustee will file with the Bankruptcy Court and serve on the U.S. Trustee quarterly financial

---

[7] The Plan Sponsor reserves the right to modify the Subscription Option, provided that (i) no such modification shall adversely impact the Plan treatment of other creditors and (ii) such modification is approved by the DIP Lender.

reports in a format prescribed by the U.S. Trustee, and the Distribution Trustee will pay post-confirmation quarterly fees to the U.S. Trustee until a final decree is entered or the case is converted or dismissed as provided in 28 U.S.C. § 1930(a)(6).

e.  <u>Professional Fee Cap.</u> Any fees or expenses of any professional retained by Debtor that exceed the budgeted amounts set forth in the Approved Budget shall be waived and not be Allowed as an Administrative Claim.

## 2.  Bar Date For Administrative Claims

a.  <u>General Provisions</u>. Except as otherwise provided in Article IV of the Plan, requests for payment of Administrative Claims must be included within an application (setting forth the amount of, and basis for, such Administrative Claims, together with documentary evidence) and Filed and served on respective counsel for the Debtor, the Distribution Trust, and Plan Sponsor no later than thirty (30) days after the Confirmation Hearing (the "<u>Administrative Claim Bar Date</u>") or by such earlier deadline governing a particular Administrative Claim contained in an order of the Bankruptcy Court entered before the Effective Date. The Debtor will serve all potential holders of claims in Classes 1, 2, 3 and 4 a notice of the Administrative Claim Bar Date upon confirmation of the Plan. Holders of Administrative Claims (unless otherwise provided in Section 4.1(c)(ii)-(iii) of the Plan) that are required to File a request for payment of such Claims and that do not File such requests by the applicable bar date specified in either Section 4.1(c)(i), (ii) or (iii) of the Plan shall be forever barred from asserting such Claims against the Debtor or any of its property, absent order of the Court to the contrary.

b.  <u>Professionals</u>. All professionals or other entities requesting compensation or reimbursement of expenses pursuant to Bankruptcy Code sections 327, 328, 330, 331, 503(b) and 1103 for services rendered before the Effective Date (including, without limitation, any compensation or commission requested by any professional or any other entity for making a substantial contribution in the Chapter 11 Case) shall File and serve on the Reorganized Debtor, the Distribution Trust, the U.S. Trustee and the Post-Confirmation Service List an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date. Objections to applications of professionals for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtor, the Distribution Trust, the U.S. Trustee and the Post-Confirmation Service List and the professionals to whose application the objections are addressed no later than twenty-one (21) days after the date the application is filed, or the Bankruptcy Court may enter an order authorizing the fees without a hearing. Any professional fees and reimbursements or expenses incurred by the Reorganized Debtor

subsequent to the Effective Date may be paid by the Reorganized Debtor without application to the Bankruptcy Court. Any professional fees and reimbursements or expenses incurred by the Distribution Trustee subsequent to the Effective Date may be paid by the Distribution Trustee without application to the Bankruptcy Court.

c. Tax Claims:  All requests for payment of Administrative Claims and other Claims by a Governmental Unit for taxes (and for interest and/or penalties related to such taxes) for any tax year or period, which accrued or was assessed within the period from and including the Petition Date through and including the Effective Date ("Post-Petition Tax Claims") and for which no bar date has otherwise been previously established, must be Filed on or before the later of (i) forty-five (45) days following the Effective Date; and (ii) ninety (90) days following the filing with the applicable Governmental Unit of the tax return for such taxes for such tax year or period.  Any holder of any Post-Petition Tax Claim that is required to File a request for payment of such taxes and does not File such a Claim by the applicable bar date shall be forever barred from asserting any such Post-Petition Tax Claim against the Debtor or its property, whether any such Post-Petition Tax Claim is deemed to arise prior to, on, or subsequent to the Effective Date.  To the extent that the holder of a Post-Petition Tax Claim holds a lien to secure its Claim under applicable state law, the holder of such Claim shall retain its lien until its Allowed Post-Petition Tax Claim has been paid in full.

### 3.    Allowed Priority Tax Claims

Each Holder of an Allowed Priority Tax Claim against Debtor shall receive, from the Consideration (subject to Section 6.4 of the Plan), in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim (a) Cash equal to the amount of such Allowed Priority Tax Claim, (b) payment in full through the fifth anniversary of the Petition Date, plus interest, or (c) such other less favorable treatment to the Holders of an Allowed Priority Tax Claim as to which the Debtor, the Plan Sponsor, and the Holder of such Allowed Priority Tax Claims shall have agreed upon in writing.

### B.    Classification and Treatment of Claims and Equity Interests

Pursuant to Bankruptcy Code section 1122, set forth below is a designation of Classes or Claims and Equity Interests. A Claim or Equity Interest is placed in a particular Class only to the extent that the Claim or Equity Interest falls within the description of that Class, and is classified in other Classes to the extent that any portion of the Claim or Equity Interest falls within the description of such other Classes. A Claim is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

1.      **Class 1:  Priority Unsecured Non-Tax Claims**

Each holder of an Allowed Priority Unsecured Non-Tax Claim against the Debtor shall receive, from the Consideration (subject to Section 6.4 of the Plan), on the Effective Date, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Priority Unsecured Non-Tax Claim, either cash equal to the full unpaid amount of such Allowed Priority Unsecured Non-Tax Claim, or such other treatment as the Debtor, the Plan Sponsor and the holder of such Allowed Priority Unsecured Non-Tax Claim shall have agreed.

Class 1 is Unimpaired and therefore holders of Priority Unsecured Non-Tax Claims are conclusively presumed to have accepted the Plan.

2.      **Class 2:  Convenience Claims**

Convenience Class Claims shall be claims in an amount of less than $25,000.00.  On or about the Effective Date, each holder of an Allowed Convenience Claim shall receive a guaranteed recovery of 30% on account of and in full and complete settlement, release and discharge of, and in exchange for its Allowed Convenience Claim.

Class 2 is Impaired and therefore holders of Convenience Claims are entitled to vote on the Plan.

3.      **Class 3:  General Unsecured Claims**

General Unsecured Claims shall be claims in an amount of $25,000.00 or more.  On or about the Effective Date, each holder of an Allowed General Unsecured Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for its Allowed General Unsecured Claim, pro rata payment from the GUC Recovery.

Class 3 is Impaired and therefore holders of General Unsecured Claims are entitled to vote on the Plan.

4.      **Class 4:  Noteholder Claim**

Each holder of an Allowed Noteholder Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for, such Allowed Noteholder Claim, the Noteholder Recovery, if any, up to the full amount of the Allowed Noteholder Claim.

Class 4 is Impaired and therefore holders of General Unsecured Claims are entitled to vote on the Plan.

5.      **Class 5:  Equity Interests**

No Distributions will be made to holders of Allowed Equity Interests. On the Effective Date, all Allowed Equity Interests shall be deemed automatically cancelled, released, and extinguished without further action by the Debtor or the Reorganized Debtor, and the obligation of the Debtor and the Reorganized Debtor thereunder shall be discharged.

Class 5 is Impaired and is deemed to reject the Plan.

### C.    Acceptance or Rejection of the Plan

#### 1.    Impaired Classes Entitled to Vote

Holders of Claims in Classes 2, 3 and 4 are impaired and each Class is entitled to vote as a Class to accept or reject the Plan. Accordingly, only the Holders of Claims in Classes 2, 3 and 4 shall be solicited with respect to the Plan.

#### 2.    Acceptance by Classes 2, 3  and 4

In accordance with Bankruptcy Code section 1126(c), and except as provided in Bankruptcy Code section 1126(e), an impaired Class of Claims shall have accepted the Plan if the Plan is accepted by the holders of at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Allowed Claims in such Class that have timely and properly voted to accept or reject the Plan.

#### 3.    Presumed Acceptances by Class 1

Class 1 is unimpaired under the Plan. Under Bankruptcy Code section 1126(f), holders of such unimpaired Claims are conclusively presumed to have accepted the Plan, and the votes of such unimpaired Claim Holders shall not be solicited.

#### 4.    Deemed Rejection by Class 5

Class 5 is impaired under the Plan and is deemed to reject the Plan. Therefore, Interest Holders in Class 5 are not entitled to vote to accept or reject the Plan.

### D.    Means for Implementation of the Plan

#### 1.    Continued Corporate Existence

Except as otherwise provided in the Plan, the Reorganized Debtor will continue to exist after the Effective Date as a corporate entity, with all of the powers of a corporation under applicable law in the jurisdiction in which the Debtor is incorporated and pursuant to its Charter Documents in effect before the Effective Date, as such documents are amended by or pursuant to the Plan.

Upon the Effective Date, and without any further action by the shareholders, directors, or officers of the Reorganized Debtor, the Reorganized Debtor's Charter Documents shall be deemed amended (a) to the extent necessary, to incorporate the provisions of the Plan, and (b) to prohibit the issuance by the Reorganized Debtor of nonvoting securities to the extent required under Bankruptcy Code section 1123(a)(6), subject to further amendment of such Charter Documents as permitted by applicable law, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval other than any requisite filings required under applicable state, provincial or federal law. The Charter Documents shall be filed with the Plan Supplement.

### 2. Management and Board of Directors

The Plan Sponsor may nominate and elect new members for the board of directors of the Reorganized Debtor in accordance with the Reorganized Debtor's Charter Documents. The identity of such new members shall be disclosed in the Plan Supplement prior to the Plan Supplement Deadline. Upon the Effective Date, the current members of the Debtor's board of directors shall no longer serve in such capacity and shall be discharged of all duties in connection therewith.

### 3. Arrangements with the Distribution Trustee

By the Plan Supplement Deadline, the Debtor shall file with the Bankruptcy Court a disclosure identifying the Distribution Trustee under the Distribution Trust. At the Confirmation Hearing, the Bankruptcy Court shall ratify such Distribution Trustee. All compensation for the Distribution Trustee shall be paid from the Distribution Trust Assets in accordance with the Distribution Trust Agreement. The approved person shall serve as the Distribution Trustee on execution of the Distribution Trust Agreement at the Closing.

### 4. The Closing

The Closing of the transactions required and contemplated under the Plan shall take place on the Effective Date at the offices of Goulston & Storrs, P.C., 885 Third Avenue, 18th Floor, New York, New York 10022, or at such other place identified in a notice provided to those parties listed in Section 13.12 of the Plan. The Debtor and Plan Sponsor may reschedule the Closing by making an announcement at the originally scheduled Closing of the new date for the Closing. A notice of the rescheduled Closing shall be filed with the Bankruptcy Court and served on the parties identified in Section 13.12 of the Plan within two (2) days after the originally scheduled Closing. All documents to be executed and delivered by any party as provided in this Article VI and all actions to be taken by any party to implement the Plan as provided herein shall be in form and substance satisfactory to the Debtor and Plan Sponsor. The following actions shall occur at or before the Closing (unless otherwise specified), and shall be effective on the Effective Date:

(a)      Execution of Documents and Corporate Action. The Debtor shall deliver all documents and perform all actions reasonably contemplated with respect to implementation of the Plan. The Debtor, or its designee, is authorized (i) to execute on behalf of the Debtor, in a representative capacity and not individually, any documents or instruments after the Confirmation Date or at the Closing that may be necessary to consummate the Plan and (ii) to undertake any other action on behalf of the Debtor to consummate the Plan. Each of the matters provided for under the Plan involving the corporate structure of the Debtor or corporate action to be taken by or required of the Debtor will, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and (to the extent taken before the Effective Date) ratified in all respects without any requirement of further action by stockholders, creditors, or directors of the Debtor. On the Effective Date, all matters provided for in the Plan involving the corporate structure of the Reorganized Debtor, and all corporate actions required by the Debtor and the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtor or the Reorganized

Debtor. For purposes of effectuating the Plan, none of the transactions contemplated in the Plan shall constitute a change of control under any agreement, contract, or document of the Debtor.

(b)      Release of Liens.  Upon request by the Debtor, the Reorganized Debtor or the Plan Sponsor, any Person holding a Lien in any of the Debtor's Property shall execute any lien release or similar document(s) required to implement the Plan or reasonably requested by the Debtor, the Reorganized Debtor or the Plan Sponsor in a prompt and diligent manner. Notwithstanding the foregoing, the Debtor, the Reorganized Debtor or the Plan Sponsor is authorized to execute any lien release or similar document(s) required to implement the Plan.

(c)      Cancellation of Equity Interests.  On the Effective Date, all existing Equity Interests of Debtor shall be retired, cancelled, extinguished and/or discharged in accordance with the terms of the Plan.  Except as otherwise provided in the Plan or the Plan Supplement, on the Effective Date: (1) the obligations of the Debtor under any certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtor giving rise to any Claim or Equity Interest shall be cancelled as to the Debtor and the Reorganized Debtor shall not have any continuing obligations thereunder and (2) the obligations of the Debtor pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtor shall be released and discharged.

(d)      Issuance of New Equity. On the Effective Date, 1,000 shares of New Equity of the Reorganized Debtor shall be issued.  The New Equity shall be free and clear of all Liens, Claims, Interests, and encumbrances of any kind, except as otherwise provided in the Plan. All the shares of the New Equity issued pursuant to the Plan shall be duly authorized, validly issued, fully paid, and non-assignable. On the Effective Date, none of the New Equity will be listed on a national securities exchange. The Reorganized Debtor may take all necessary actions, if applicable, after the Effective Date to suspend any requirement to (i) be a reporting company under the Securities Exchange Act, and (ii) file reports with the Securities and Exchange Commission or any other entity or party.

(e)      Funding of the Consideration.  On the Effective Date, the Plan Sponsor shall contribute to the Debtor or Distribution Trust an amount of Cash equal to the Cash Consideration in consideration of the Plan Sponsor's purchase of the New Equity. Funding of the Consideration is not subject to any financing contingency.  The Consideration shall be used to fund Distributions under the Plan.  To the extent any amount of Allowed DIP Lender Claim remains after the DIP Lender exercises the Subscription Option, the remainder of its Allowed DIP Lender Claim shall be repaid in Cash funded and paid by the Plan Sponsor on the Effective Date, separately and in addition to the Consideration on the Effective Date, or reduced on a dollar-for-dollar basis by agreement between the DIP Lender and the Plan Sponsor. For the avoidance of doubt, in no event will the DIP Lender's exercise of the Subscription Option reduce the amount of the Cash Consideration paid by Plan Sponsor.

(f)      Execution and Ratification of the Distribution Trust Agreement.  On the Effective Date, the Distribution Trust Agreement shall be executed by all parties thereto.  The

Distribution Trust Agreement shall be provided in the Plan Supplement. Each holder of a Claim shall be deemed to have ratified and become bound by the terms and conditions of the Distribution Trust Agreement.

(g)    Transfer of Distribution Trust Assets. All property of the Debtor constituting the Distribution Trust Assets shall be conveyed and transferred by the Debtor to the Distribution Trust, free and clear of all Liens, Claims, Equity Interests, and encumbrances.

## 5.    Tax Treatment of the Distribution Trust

The Distribution Trust established under the Plan is established for the purpose of distributions to holders of Allowed Claims by liquidating the Distribution Trust Assets transferred to the Distribution Trust and performing related and incidental functions referenced in the Distribution Trust Agreement, and the Distribution Trust shall have no objective of continuing or engaging in any trade or business except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the trust. The purpose of the Distribution Trust is to distribute the Distribution Trust Assets and the proceeds of the liquidation, net of all claims, expenses, charges, liabilities, and obligations of the Distribution Trust, to the Beneficiaries in accordance with the terms of the Plan. No business activities will be conducted by the Distribution Trust other than those associated with or related to the liquidation of the Distribution Trust Assets. It is intended that the Distribution Trust be classified for federal income tax purposes as a "liquidating trust" within the meaning of the Treasury Regulations Section 301.7701-4(d). All parties and Beneficiaries shall treat the transfers in trust described in the Plan as transfers to the Beneficiaries for all purposes of the Internal Revenue Code of 1986, as amended (including Sections 61(a)(12), 483, 1001, 1012, and 1274 thereof). All the parties and Beneficiaries shall treat the transfers in trust as if all the transferred assets, including all the Distribution Trust Assets, had been first transferred to the Beneficiaries and then transferred by the Beneficiaries to the Distribution Trust. The Beneficiaries shall be treated for all purposes of the Internal Revenue Code of 1986, as amended, as the grantors of the Distribution Trust and the owners of the Distribution Trust. The Distribution Trustee shall file returns for the Distribution Trust as a grantor trust pursuant to Treasury Regulations Section 1.671-4(a) or (b). All parties, including the Beneficiaries and the Distribution Trustee, shall value the Distribution Trust Assets consistently, and such valuations shall be used for all federal income tax purposes. Beneficiaries may wish to consult with a tax professional regarding the tax consequences of holding a Beneficial Interest in or receiving a Distribution from the Distribution Trust.

## 6.    Preservation of Rights of Action

Unless any Rights of Action against a Person are expressly waived, relinquished, exculpated, released, compromised, transferred or settled in the Plan or by a Final Order, in accordance with Bankruptcy Code section 1123(b), the Reorganized Debtor shall retain and may enforce all rights to commence and pursue any and all Rights of Action, and the Reorganized Debtor's rights to commence, prosecute or settle such Rights of Action shall be preserved notwithstanding the occurrence of the Effective Date. For the avoidance of doubt, the Reorganized Debtor shall retain and shall have the exclusive right to enforce any and all of the Debtor's claims, rights and causes of action including, without limitation, those arising from or related to its (a) Intellectual Property and (b) accounts receivable and cash (including, without limitation, claims

for turnover of cash of the Debtor being held in escrow or on deposit by third parties) and shall be the sole beneficiary of any contested matters, claims objections, proceedings or similar actions in connection therewith.

### 7.    Vesting of Property in Reorganized Debtor

On the Effective Date, except as otherwise expressly provided in the Plan or Confirmation Order, all Estate Property, other than the Distribution Trust Assets, shall vest in the Reorganized Debtor free and clear of all Liens, Claims, Equity Interests, and encumbrances of any kind, except as otherwise provided in the Plan.

On the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its business and may use, acquire, or dispose of property, without supervision of approval by the Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### 8.    Tax Exemption

The Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments and equity securities under or in connection with the Plan; (b) the creation, assignment, recordation or perfection of any lien, pledge, other security interest or other instruments of transfer; (c) the making or assignment of any lease; (d) the creation, execution and delivery of any agreements or other documents creating or evidencing the formation of the Reorganized Debtor or the issuance or ownership of any interest in the Reorganized Debtor; or (e) the making or delivery of any deed or other instrument of transfer under the Plan in connection with the vesting of the Estate's assets in the Reorganized Debtor or the Distribution Trust pursuant to or in connection with the Plan, including, without limitation, merger agreements, stock purchase agreement, agreements of consolidation, restructuring, disposition, liquidation or dissolution, and transfers of tangible property.  Pursuant to section 1146 of the Bankruptcy Code and the Plan, any such act described or contemplated herein will not be subject to any stamp tax, transfer tax, filing or recording tax, or other The Plan and the Confirmation Order provide for (a) the issuance, transfer or exchange of notes, debt instruments and equity securities under or in connection with the Plan; (b) the creation, assignment, recordation or perfection of any lien, pledge, other security interest or other instruments of transfer; (c) the making or assignment of any lease; (d) the creation, execution and delivery of any agreements or other documents creating or evidencing the formation of the Reorganized Debtor or the issuance or ownership of any interest in the Reorganized Debtor; or (e) the making or delivery of any deed or other instrument of transfer under the Plan in connection with the vesting of the Estate's assets in the Reorganized Debtor or the Distribution Trust pursuant to or in connection with the Plan, including, without limitation, merger agreements, stock purchase agreement, agreements of consolidation, restructuring, disposition, liquidation or dissolution, and transfers of tangible property. Pursuant to Bankruptcy Code section 1146 and the Plan, any such act described or contemplated in the Plan will not be subject to any stamp tax, transfer tax, filing or recording tax, or other similar tax.

### 9.    No Successor Liability

Pursuant to Bankruptcy Code section 1141 and Article XI of the Plan, the property of the Debtor's estate shall vest in the Reorganized Debtor, free and clear of all claims and interests of

creditors and equity holders of the Debtor. Moreover, pursuant to Bankruptcy Code section 1141(d), the effect of confirmation of the Plan shall be to discharge the Debtor from any debt that arose before the Effective Date, and any debt of a kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i).

The issuance of New Equity or transfer of assets through the Plan shall not result in the Reorganized Debtor (a) having any liability or responsibility for any Claim against or Equity Interest in the Debtor, the Debtor's estate, or Insider of the Debtor, or (b) having any liability or responsibility to the Debtor or the Debtor, each except as expressly set forth in the Plan. Without limiting the effect or scope of the foregoing, and to the fullest extent permitted by applicable laws, the issuance of the New Equity or transfer of assets contemplated in the Plan shall not subject the Reorganized Debtor, its properties or assets or affiliates, successors, or assigns to any liability for Claims against the Debtor's interests in such assets by reason of such issuance of New Equity or transfer of assets under any applicable laws, including, without limitation, any successor liability.

### E.   Treatment of Executory Contracts and Unexpired Leases

#### 1.   Assumption of Executory Contracts

On the Effective Date, subject to the procedures related to assumption of Executory Contracts set forth in Section 8.3 of the Plan, all Executory Contracts identified on the Schedule of Assumed Contracts and Unexpired Leases, to be attached as <u>Exhibit B</u> to the Plan, shall be deemed assumed by the Reorganized Debtor. The Plan Sponsor may amend the Schedule of Assumed Contracts and Unexpired Leases at any time prior to the Effective Date. Entry of the Confirmation Order shall constitute approval of the assumption of such Executory Contracts under Bankruptcy Code sections 365 and 1123.

#### 2.   Rejection of Executory Contracts

All Executory Contracts not identified on the Schedule of Assumed Contracts and Unexpired Leases (or assumed by the Debtor previously) shall be deemed rejected on the Effective Date. Entry of the Confirmation Order shall constitute approval of such rejections under Bankruptcy Code sections 365 and 1123. Notwithstanding the rejection of an Executory Contract, the terms of any confidentiality agreement or covenant not to compete contained in the Plan shall survive and remain in full force and effect for the term thereof.

The Debtor will reject prior to the Effective Date, and the Reorganized Debtor will not assume, any employment, severance, bonus, incentive, commission, compensation or similar agreement or plan (or any agreement outside the ordinary course of business) with any employees, officers or directors. To the extent the 401(k) Plan has not yet been formally rejected and/or terminated prior to the Effective Date, such 401(k) Plan shall be deemed rejected as of the Effective Date, and the Debtor shall take all steps necessary prior to the Effective Date to effectuate termination of the 401(k) Plan. To the extent not already rejected, any employee handbook of the Debtor shall be deemed rejected as of the Effective Date, and terminated without any action of the Debtor, and the Reorganized Debtor will not assume any employee handbook of the Debtor.

On the Effective Date, any and all equity based incentive plans or stock ownership plans of the Debtor, including all agreements related thereto, entered into before the Effective Date, or

25

other plans, agreements or documents giving rise to Equity Interests, including the contingent cash components of any such plans, agreements, or documents, shall be immediately terminated without any action of the Debtor, the Debtor, the Reorganized Debtor or the Plan Sponsor. To the extent such plans, agreements or documents are considered to be Executory Contracts, such plans, agreements or documents shall be deemed to be, and shall be treated as though they are, Executory Contracts that are rejected pursuant to Bankruptcy Code section 365 under the Plan. From and after the Effective Date, all warrants, stock options and other equity awards outstanding or issued at such time, whether included in a warrant, plan, contract, agreement or otherwise, will have no value, shall be cancelled and extinguished and thus will not entitle any holder thereof to purchase or otherwise acquire any equity interests in the Reorganized Debtor.

### 3.    Procedures Related to Assumption of Executory Contracts

#### a)    Establishment of Cure Claim Amounts

The Cure Amounts associated with the assumption of the Executory Contracts pursuant to Section 8.1 of the Plan will be specified in a notice served by the Debtor on the counterparties to Executory Contracts (the "Cure Notice"). The Debtor and the Plan Sponsor reserve to right to amend or supplement the Cure Notice with additional Executory Contracts and/or amended Cure Amounts.

Any Objection to Cure Notice including (i) an objection to the applicable Cure Amount (a "Cure Objection") and (ii) an objection to the adequate assurance of future performance (a "Adequate Assurance Objection") to be provided by the Plan Sponsor on behalf of the Reorganized Debtor regarding any Executory Contract must be in writing, filed with the Court, and served upon (a) the Debtor, (b) counsel to the Debtor, (c) counsel to the Plan Sponsor, and (d) the U.S. Trustee, by no later than [DATE] (the "Objection Deadline"). The objection must set forth the specific default alleged under the applicable Assumed Contract or Unexpired Lease and claim a specific monetary amount that differs from the applicable Cure Amount, if any, and/or further information required of the Reorganized Debtor with respect to adequate assurance of future performance.

If no Objection to the Adequate Assurance Objection is received by the Objection Deadline to an Assumed Contract or Unexpired Lease, then the assumption of such Assumed Contract or Unexpired Lease shall be authorized pursuant to Bankruptcy Code section 365 and the applicable Cure Amount as provided in the Cure Notice (the "Cure Amount"), if any, shall be binding upon the non-Debtor counterparty to such Assumed Contract or Unexpired Lease for all purposes and shall constitute a final determination of the cure amount required to be paid to such Assumed Contract or Unexpired Lease counterparty in connection with the assumption of such Assumed Contract or Unexpired Lease, and the non-Debtor counterparty to such Assumed Contract or Unexpired Lease shall be deemed to have waived its right to object to, contest, condition, or otherwise restrict the assumption of such Assumed Contract or Unexpired Lease (including, without limitation, from asserting any additional cure or other amounts with respect to the Assumed Contract or Unexpired Lease arising prior to such assumption). Furthermore, upon the assumption of such Assumed Contract or Unexpired Lease, the Reorganized Debtor shall enjoy all of the Debtor's rights and benefits thereunder without the necessity of obtaining any party's written consent to the Debtor's assumption of such rights and benefits.

26

b)      Objection to Disputed Cure Amounts

The Plan Sponsor shall have the right to examine any Objection to Cure Amount filed by any party, and shall have the right to object to and contest the Disputed Cure Amount asserted therein.

If an objection to a Disputed Cure Amount has not been resolved by the Bankruptcy Court or agreement of the parties by the Effective Date, the Executory Contract related to such Disputed Cure Amount shall be deemed assumed by the Reorganized Debtor effective on the Effective Date; provided, however, the Reorganized Debtor may revoke an assumption of any such Executory Contract within ten (10) days after entry of an order by the Bankruptcy Court adjudicating the objection to the Disputed Cure Amount related to the Executory Contract by filing a notice of such revocation with the Bankruptcy Court and serving a copy on the party(ies) whose Executory Contract is rejected. Any Executory Contract identified in a revocation notice shall be deemed rejected retroactively to the Effective Date.

c)      Payment of Cure Amounts

Within ten (10) Business Days after the Effective Date, the Distribution Trustee shall pay all Cure Amounts related to Executory Contracts listed on the Cure Notice, other than Disputed Cure Amounts, from out of the Consideration.

Subject to Section 8.3(b) of the Plan, the Distribution Trustee shall pay all Cure Amounts that are subject to an objection on the later of (i) within ten (10) Business Days after the Effective Date or (ii) within ten (10) Business Days after entry of an order by the Bankruptcy Court resolving the objection or approving an agreement between the parties concerning the Cure Amount.

d)      No Admission of Liability.

Neither the inclusion nor exclusion of any Executory Contract by the Debtor and the Plan Sponsor on the Cure Notice, nor anything contained in the Plan, shall constitute an admission by the Debtor or the Plan Sponsor that any such contract or unexpired lease is in fact an Executory Contract or that the Debtor has any liability thereunder.

e)      Reservation of Rights.

Nothing in the Plan shall waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, causes of action, or other rights of the Debtor under any executory or non-executory contract or any unexpired or expired lease, nor shall any provision of the Plan increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtor under any such contract or lease.

**4.      Rejection Claim Bar Date**

Each Claim resulting from the rejection of an Executory Contract, pursuant to Section 8.2 of the Plan, shall be filed with the Bankruptcy Court no later than the Rejection Claim Bar Date; provided, however, any party whose Executory Contract is rejected pursuant to a revocation notice, pursuant to Section 8.3(b) of the Plan, may file a rejection damage Claim arising out of such

11328289/2

rejection within thirty (30) days after the filing of the revocation notice with the Bankruptcy Court. Any Claim resulting from the rejection of an Executory Contract not filed by the applicable deadline shall be discharged and forever barred, and shall not be entitled to any Distributions under the Plan. The Distribution Trustee shall have the right to object to any rejection damage Claim.

### 5.    Indemnification Obligations

Any obligation of the Debtor to indemnify, reimburse, or limit the liability of any Person, including any officer or director of the Debtor, or any agent, professional, financial advisor, or underwriter of any securities issued by the Debtor, relating to any acts or omissions occurring before the Effective Date, whether arising pursuant to charter, bylaws, contract or applicable state law, shall be deemed to be, and (a) shall be treated as, a General Unsecured Claim and/or Executory Contract and shall be deemed to be rejected, canceled, and discharged pursuant to the Plan as of the Effective Date and (b) any and all Claims resulting from such obligations are disallowed under Bankruptcy Code section 502(e) or other applicable grounds, including Bankruptcy Code section 502(d) or violations of Bankruptcy Code sections 327, 362, 363 or other requirements of the Bankruptcy Code, or if any court of applicable jurisdiction rules to the contrary, such Claim shall be estimated pursuant to Bankruptcy Code section 502(c) in the amount of $0 or such other amount as the Bankruptcy Court shall determine.

### F.    Provisions Governing Distributions of Property

### 1.    Distributions Procedures Regarding Allowed Claims

#### a)    In General.

The Distribution Trustee shall make all Distributions required to be made under the Plan, including Distributions from the Distribution Trust.

#### b)    Distributions on Allowed Claims Only.

Distributions from Available Cash shall be made only to the holders of Allowed Claims. Unless and until a Disputed Claim becomes an Allowed Claim, the holder of that Disputed Claim shall not receive a Distribution from Available Cash. For the avoidance of doubt, no Distributions shall be made to holders of Allowed Equity Interests.

#### c)    Place and Manner of Payments of Distributions.

Except as otherwise specified in the Plan, Distributions from Available Cash shall be made by mailing such Distribution to the Creditor at the address listed in any proof of claim or interest filed by the Creditor or at such other address as such Creditor shall have specified for payment purposes in a written notice received by the Distribution Trustee at least twenty (20) days before a Distribution Date. If a Creditor has not filed a proof of claim or sent the Distribution Trustee a written notice of payment address, then the Distribution(s) for such Creditor will be mailed to the address identified in the Schedules of Assets and Liabilities. The Distribution Trustee shall distribute any Cash by wire, check, or such other method as it deems appropriate under the circumstances. Before receiving any Distributions, all Creditors, at the request of the Distribution Trustee, must provide written notification of their respective Federal Tax Identification Numbers

or Social Security Numbers to the Distribution Trustee; otherwise, the Distribution Trustee may suspend Distributions to any Creditors who have not provided their Federal Tax Identification Numbers or Social Security Numbers.

d)       Undeliverable Distributions.

If a Distribution made from Available Cash to any Creditor is returned as undeliverable, the Distribution Trustee shall use reasonable efforts to determine the then current address for such Creditor. If the Distribution Trustee cannot determine, or is not notified of, a then current address for such Creditor or Interest Holder within six months after the Effective Date, the Distribution reserved for such Creditor shall be deemed an unclaimed Distribution, and Section 7.5(e) of the Plan shall be applicable thereto.

e)       Unclaimed Distributions.

If the current address for a Creditor entitled to a Distribution from Available Cash under the Plan has not been determined or such Creditor has otherwise not been located within six months after the Effective Date or submitted a valid Federal Tax Identification Number or Social Security Number to the Distribution Trustee within three months after the Distribution Trustee made a request therefor, then such Creditor shall forfeit the Distribution on the Claim and any amounts to which the Creditor would have otherwise been entitled shall become Available Cash to pay other Allowed Claims.

f)       Withholding.

The Distribution Trustee may, but shall not be required to, at any time withhold from a Distribution from Available Cash to any Person (except the Internal Revenue Service) amounts sufficient to pay any tax or other charge that has been or may be imposed on such Person with respect to the amount distributable or to be distributed under the income tax laws of the United States or of any state or political subdivision or entity by reason of any Distribution provided for in the Plan, whenever such withholding is determined by the Distribution Trustee (in its sole discretion) to be required by any law, regulation, rule, ruling, directive, or other governmental requirement. The Distribution Trustee, in the exercise of its sole discretion and judgment, may enter into agreements with taxing or other authorities for the payment of such amounts that may be withheld in accordance with the provisions of the Plan.

g)       Dissolution.

i.       The Distribution Trustee and Distribution Trust shall be discharged or dissolved, as the case may be, at such time as all of the Distribution Trust Assets have been distributed pursuant to the Plan and the Distribution Trust Agreement; provided, however, that in no event shall the Distribution Trust be dissolved later than three (3) years from the creation of the Distribution Trust unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension is necessary to facilitate or complete the liquidation of the Distribution Trust Assets. Such extensions in aggregate shall not exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the Internal Revenue

29

Service or an opinion of counsel satisfactory to the Distribution Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes.

ii. If at any time the Distribution Trustee determines, in reliance upon such professionals as a Distribution Trustee may retain, that the expense of administering the Distribution Trust so as to make a final distribution to Distribution Trust Beneficiaries is likely to exceed the value of the assets remaining in the Distribution Trust, the Distribution Trustee may (i) reserve any amount necessary to dissolve the Distribution Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the Internal Revenue Code, (B) exempt from United States federal income tax under section 501(a) of the Internal Revenue Code, (C) not a "private foundation," as defined in section 509(a) of the Internal Revenue Code, and (D) that is unrelated to the Debtor, the Distribution Trust, and any insider of the Distribution Trustee, and (iii) dissolve the Distribution Trust.

### 2.    Procedures Regarding Distributions from the Distribution Trust

Procedures regarding Distributions from the Distribution Trust shall be governed by the Distribution Trust Agreement.

### G.    Procedures for Resolution of Disputed Claims

### 1.    Right to Object to Claims

Notwithstanding anything to the contrary in the Plan, subject to the terms and conditions set forth in the Distribution Trust Agreement, and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, except insofar as a Claim is Allowed under the Plan on and after the Effective Date, the Distribution Trustee and the Reorganized Debtor shall have the authority, but not the obligation, to: (1) file, withdraw or litigate to judgment objections to and requests for estimation of Claims; (2) settle or compromise any Disputed Claim without any further notice to or action, order or approval by the Bankruptcy Court; and (3) administer and adjust the Claims register to reflect any such settlements or compromises without any further notice to or action, order or approval by the Bankruptcy Court. The Distribution Trustee shall succeed to any pending objections to Claims filed by the Debtor prior to the Effective Date, and shall have and retain any and all rights and defenses the Debtor had immediately prior to the Effective Date with respect to any Disputed Claim. The Reorganized Debtor shall provide commercially reasonable assistance and cooperation to the Distribution Trustee, at the Distribution Trustee's cost, in connection with the Distribution Trustee's prosecution of objections to Claims, including, without limitation, reasonable access to the books and records of the Debtor or the Reorganized Debtor (as the case may be) and other information reasonably requested by the Distribution Trustee to enable the Distribution Trustee to perform its obligations under the Distribution Trust Agreement; provided that the Distribution Trustee will keep all such information confidential and will not disclose any information provided by the Reorganized Debtor without express written consent of the Reorganized Debtor. Further, notwithstanding anything to the contrary, no provision by the Reorganized Debtor of any privileged information to the Distribution Trustee will waive the privilege. The Distribution Trustee will cooperate fully with the Reorganized Debtor in preserving privilege and confidentiality of any information provided by the Reorganized Debtor to the

Distribution Trustee. Nothing in the Plan or this Disclosure Statement shall impose upon or require the Reorganized Debtor to preserve or maintain the Debtor's books and records for any purpose beyond twelve months following the Effective Date unless the Distribution Trustee notifies the Reorganized Debtor before that time that the Distribution Trustee has no further need to have access to such books and records.

### 2.    Deadline for Objecting to Claims

Objections to Claims must be filed with the Bankruptcy Court, and a copy of the objection must be served on the subject Creditor before the expiration of the Claim Objection Deadline (unless such period is further extended by subsequent orders of the Bankruptcy Court); otherwise such Claims shall be deemed Allowed in accordance with Bankruptcy Code section 502. The objection shall notify the Creditor of the deadline for responding to such objection.

### 3.    Deadline for Responding to Claim Objections

No later than seven (7) days prior to a hearing scheduled with respect to the Objection to a Claim, or such other date as is indicated on such objection or the accompanying notice thereof, the Creditor whose Claim was objected to must file a written response to the objection with the Bankruptcy Court and serve a copy on the Distribution Trustee. Failure to file a written response within the applicable deadline may cause the Bankruptcy Court to enter a default judgment against the non-responding Creditor or granting the relief requested in the claim objection.

### 4.    Right to Request Estimation of Claims

Pursuant to Bankruptcy Code section 502(c), each of the Debtor, the Reorganized Debtor, and the Distribution Trustee may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated or any Disputed Claim arising from a right to an equitable remedy or breach of performance.

## H.    Injunctions, Releases, and Discharge

### 1.    Discharge and Release

The Plan contains a release of the Debtor which provides:

**To the fullest extent provided under Bankruptcy Code section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code, except as otherwise expressly provided by the Plan or the Confirmation Order, all distributions under the Plan will be in exchange for, and in complete satisfaction, settlement, discharge, and release of, all Claims and causes of action, whether known or unknown, including any interest accrued on such Claims from and after the Petition Date, against, liabilities of, Liens on, obligations of, rights against, and Equity Interests in the Debtor or any of its assets or properties, and regardless of whether any property will have been distributed or retained pursuant to the Plan on account of such Claims or Equity Interests. Except as otherwise expressly provided by the Plan or the Confirmation Order, upon the Effective Date, the Debtor and its estate will be deemed discharged and released under and to the fullest extent provided under Bankruptcy Code section 1141(d)(1)(A) and other applicable provisions of the Bankruptcy Code from any and**

**all Claims and Equity Interests of any kind or nature whatsoever, including, but not limited to, demands and liabilities that arose before the Confirmation Date, and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i). The Confirmation Order shall be a judicial determination of the discharge of all Claims against and Equity Interests in the Debtor, subject to the occurrence of the Effective Date.**

### 2. Discharge Injunction

The Plan contains a discharge injunction which provides:

**Except as otherwise expressly provided in the Plan, the discharge and releases set forth in Section 11.1 of the Plan shall also operate as an injunction permanently prohibiting and enjoining the commencement or continuation of any action or the employment of process with respect to, or any act to collect, recover from, or offset (a) any Claim discharged and released in Section 11.1 of the Plan, or (b) any cause of action, whether known or unknown, based on the same subject matter as any Claim discharged and released in Section 11.1 of the Plan. Except as otherwise expressly provided in the Plan, all Persons shall be precluded and forever barred from asserting against the Debtor and the Reorganized Debtor, their successors or assigns, or their assets, properties, or interests in property any other or further Claims, or any other right to legal or equitable relief regardless of whether such right can be reduced to a right to payment, based upon any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date, whether or not the facts of or legal bases therefor were known or existed prior to the Effective Date.**

### 3. Exculpation and Limitation of Liability

The Plan contains an exculpation in favor of the Debtor and its representatives and professionals with respect to post-petition and pre-Effective Date acts which provides:

**The Exculpated Parties will neither have nor incur any liability to any entity for any claims or causes of action arising on or after the Petition Date and prior to or on the Effective Date for any act taken or omitted to be taken in connection with, or related to formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor, the approval of the Disclosure Statement or confirmation or consummation of the Plan; provided, however, that the foregoing provisions will have no effect on the liability of any entity that results from any such act or omission that is determined in a Final Order of the Bankruptcy Court or other court of competent jurisdiction to have constituted gross negligence or willful misconduct; provided, further, that the Debtor will be entitled to rely upon the advice of counsel concerning their duties pursuant to, or in connection with, the above referenced documents, actions or inactions.**

### 4.  Releases by the Debtor

The Plan contains the Debtor's release of the Reorganized Debtor, the Plan Sponsor, the DIP Lender, the Noteholders and their respective representatives, professionals and affiliates which provides:

**Notwithstanding anything to the contrary in the Plan or the Confirmation Order, effective as of the Effective Date, for good and valuable consideration provided by each of the Released Parties, the adequacy of which is hereby acknowledged and confirmed, the Debtor will be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever provided a full discharge, waiver and release to the Released Parties and their respective related parties (and each such Released Party and their respective related parties so released shall be deemed forever released and waived by the Debtor) and their respective properties from any and all released claims that the Debtor, the Estate, and the Reorganized Debtor or their respective related parties would have been legally entitled to assert in their own right, on behalf of one another, or on behalf of another party against the Released Parties or their respective related parties; provided, however, that the foregoing provisions of this release shall not operate to waive or release (i) the rights of the Debtor to enforce the Plan and the contracts, instruments, releases and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to final order of the Bankruptcy Court; and/or (ii) any defenses against a third party.**

**The foregoing release shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization or approval of any person and the Confirmation Order will permanently enjoin the commencement or prosecution by any person or entity, whether directly, derivatively or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this release.**

### 5.  Releases by Third Parties

The Plan also contains a release by third parties, including Creditors, in favor of the Reorganized Debtor, the Plan Sponsor, the DIP Lender, the Noteholders and their respective representatives, professionals and affiliates which provides:

**To the extent allowed by applicable law, on, and as of, the Effective Date and for good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Released Parties shall be forever released from any and all claims, obligations, actions, suits, rights, debts, accounts, causes of action, remedies, avoidance actions, agreements, promises, damages, judgments, demands, defenses, or claims in respect of equitable subordination, and liabilities throughout the world under any law or court ruling through the Effective Date (including all claims based on or arising out of facts or circumstances that existed as of or prior to the Effective Date, including claims based on negligence or strict liability, and further including any derivative claims asserted on behalf of the Debtor, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity or otherwise, that the Debtor, its Estate, or the Reorganized Debtor would have been legally entitled by**

33

**applicable law to assert in its own right, whether individually or collectively) which the Debtor, its Estate, the Reorganized Debtor, Creditors or other persons receiving or who are entitled to receive Distributions under the Plan may have against any of them in any way related to the Chapter 11 Case or the Debtor (or its predecessors); provided however that the foregoing release is granted only by the (a) Creditors who are unimpaired, (b) Creditors who returned a Ballot and did not check the opt-out box on the Ballot, and (c) Creditors who were sent a solicitation package but did not vote and did not return a Ballot with the opt-out box checked; provided further, however that the release provided in this Section 11.5 shall not apply to any Creditor in category (c) above if the solicitation package was returned to the Debtor as undelivered, and that such Creditor did not otherwise file a ballot; and provided further, however, that the release provided in this Section 11.5 shall not extend to any claims by any Governmental Unit with respect to criminal liability under applicable law, willful misconduct or bad faith under applicable law, or *ultra vires* acts under applicable law.**

**For the avoidance of doubt, nothing in Article XI of the Plan shall prevent the enforcement of the terms of the Plan.**

With regard to all Released Parties, releases are appropriate for several reasons: (1) the Plan is expected to be overwhelmingly accepted by creditors; (2) each Released Party has made substantial contributions in exchange for the releases provided for its benefit under the Plan; (3) each Released Party shared an identity of interest in the common goal of confirmation of the Plan; and (4) the Debtor believes that the releases provided in the Plan are of little or no value to its estate as the Debtor does not believe that any claims exist against any Released Party at this time.

ESW Capital, LLC is entitled to releases under the Plan. As the DIP Lender and Plan Sponsor, ESW Capital, LLC has made substantial contributions to the Plan. Without ESW, Capital LLC, the Plan would not be possible and ESW Capital, LLC would not serve as Plan Sponsor.

Oak and Hunt are entitled to releases under the Plan. Each served on the Debtor's Board of Directors and are entitled to indemnification. Therefore, any claims asserted against them would, in essence, be a claim against the Debtor, thus imposing additional costs upon the Estate and the Reorganized Debtor.  In addition, their willingness to permit the payment of 30% recoveries to holders of Allowed General Unsecured Claims prior to sharing in any recovery on account of the Noteholder Claim is a substantial benefit to the success of this Chapter 11 Case.

I.    **Conditions to Confirmation and Effectiveness**

1.    **Conditions to Confirmation**

The Confirmation Order will not be effective unless (a) the Confirmation Order shall be in form and substance acceptable to the Plan Sponsor, in its reasonable discretion, and shall provide for the Plan Sponsor and the DIP Lender to acquire the New Equity subject to the Subscription Option, free and clear of all Liens, Claims, Equity Interests and encumbrances of any kind, except as otherwise provided in the Plan, (b) the final version of the Plan, Plan Supplement, and any other documents, or schedules thereto, shall have been filed in form and substance acceptable to the Plan Sponsor in its reasonable discretion, and (c) no breach or failure to comply with the terms of the

34

DIP Order, the DIP Note, the RSA, the Plan or any other material order of the Bankruptcy Court shall have occurred and be continuing.

### 2.     Conditions to Effectiveness

The Plan will not be effective unless (a) the conditions to confirmation above have been either satisfied, or waived, by the Plan Sponsor, (b) the Confirmation Order has been entered by the Bankruptcy Court, and no stay or injunction is in effect with respect thereto, (c) no breach or failure to comply with the terms of the DIP Order, the DIP Note, the RSA, the Plan, the Confirmation Order or any other material order of the Bankruptcy Court shall have occurred and be continuing; (d) the Plan Sponsor and the DIP Lender shall acquire the New Equity subject to the Subscription Option, free and clear of all Liens, Claims, Equity Interests and encumbrances of any kind, except as otherwise provided in the Plan, and (e) the Debtor has not caused, or as to Insiders, permitted to occur, (i) a Material Adverse Change with respect to the Debtor's Intellectual Property or (ii) an "ownership change" as such term is used in section 382 of title 26 of the United States Code.

### J.     Modification, Revocation or Withdrawal of the Plan

### 1.     Defects, Omissions, and Amendments of the Plan

The Debtor may, with the consent of the Plan Sponsor and the approval of the Bankruptcy Court and without notice to holders of Claims and Equity Interests, insofar as it does not materially and adversely affect holders of Claims and Equity Interests, correct any defect, omission, or inconsistency in the Plan in such a manner and to such extent necessary or desirable to expedite the execution of the Plan.  The Debtor may, with the consent of the Plan Sponsor, propose amendments or alterations to the Plan before the Confirmation Hearing as provided in section 1127 of the Bankruptcy Code if, in the opinion of the Bankruptcy Court, the modification does not materially and adversely affect the interests of holders of Claims and Equity Interests, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code and the Debtor has complied with section 1125 of the Bankruptcy Code.  The Debtor may, with the consent of the Plan Sponsor, propose amendments or alterations to the Plan after the Confirmation Date but prior to substantial consummation, in a manner that, in the opinion of the Bankruptcy Court, does not materially and adversely affect holders of Claims and Equity Interests, so long as the Plan, as modified, complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtor has complied with section 1125 of the Bankruptcy Code, and after notice and a hearing, the Bankruptcy Court confirms such Plan, as modified, under section 1129 of the Bankruptcy Code.

### 2.     Withdrawal of the Plan

The Debtor reserves the right to withdraw the Plan, provided that the Plan Sponsor consents, at any time prior to the Confirmation Date. If the Debtor withdraws the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur by December 6, 2019, unless otherwise extended by mutual agreement of the Debtor and the Plan Sponsor or the Effective Date does not occur by December 11, 2019, unless otherwise extended by mutual agreement of the Debtor and the Plan Sponsor, then the Plan shall be deemed null and void. In such event, nothing contained herein shall be deemed to constitute an admission, waiver or release of any claims by or

against the Debtor or any other person, or to prejudice in any manner the rights of the Debtor, the Debtor's Estate, or any person in any further proceedings involving the Debtor.

**K.    Retention of Jurisdiction**

**1.    Bankruptcy Court Jurisdiction**

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court shall retain and have such jurisdiction over the Chapter 11 Case to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

a. To allow, disallow, determine, liquidate, classify or establish the priority or secured or unsecured status of or estimate any Right of Action, Claim or Equity Interest, including, without limitation, the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims or Equity Interests;

b. To ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

c. To determine any and all applications or motions pending before the Bankruptcy Court on the Effective Date of the Plan, including without limitation any motions for the rejection, assumption or assumption and assignment of any Executory Contract;

d. To consider and approve any modification of the Plan, remedy any defect or omission, or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order;

e. To determine all controversies, suits and disputes that may arise in connection with the interpretation, enforcement or consummation of the Plan or any Plan Documents or any entity's obligations in connection with the Plan or any Plan Documents, or to defend any of the rights, benefits, Estate Property transferred, created, or otherwise provided or confirmed by the Plan or the Confirmation Order or to recover damages or other relief for violations thereof;

f. To consider and act on the compromise and settlement of any claim or cause of action by or against the Debtor, the Estate, the Reorganized Debtor or the Distribution Trustee;

g. To decide or resolve any and all applications, motions, adversary proceedings, contested or litigated matters, and any other matters, or grant or deny any applications involving the Debtor, the Debtor or the Estate that may be pending on the Effective Date or that may be brought by the Debtor, the Reorganized Debtor, or the Distribution Trustee (as applicable), or any other related proceedings by the Reorganized Debtor, and to enter and enforce any default judgment on any of the foregoing;

h. To decide or resolve any and all applications filed for compensation;

i. To issue orders in aid of execution and implementation of the Plan or any Plan Documents to the extent authorized by Bankruptcy Code section 1142 or provided by the terms of the Plan;

j. To decide issues concerning the federal or state tax liability of the Debtor which may arise in connection with the confirmation or consummation of the Plan or any Plan Documents;

k. To interpret and enforce any orders entered by the Bankruptcy Court in the Chapter 11 Case; and

l. To enter an order closing this Chapter 11 Case when all matters contemplating the use of such retained jurisdiction have been resolved and satisfied.

## 2.    Limitations on Jurisdiction

In no event shall the provisions of the Plan be deemed to confer in the Bankruptcy Court jurisdiction greater than that established by the provisions of 28 U.S.C. §§ 157 and 1334, as well as the applicable circumstances that continue jurisdiction for defense and enforcement of the Plan and Plan Documents. For the avoidance of doubt, however, such jurisdiction shall be deemed, by the entry of the Confirmation Order, to:

a. Permit entry of a final judgment by the Bankruptcy Court in any core proceeding referenced in 28 U.S.C. § 157(b) and to hear and resolve such proceedings in accordance with 28 U.S.C. § 157(c) and any and all related proceedings, including, without limitation, (i) all proceedings concerning disputes with, or Rights of Action or Claims against, any Person that the Debtor, the Estate, the Distribution Trust or the Reorganized Debtor or any of their successors or assigns, may have, and (ii) any and all Rights of Action or other Claims against any Person for harm to or with respect to (x) any Estate Property, including any infringement of  Intellectual Property or conversion of Estate Property, or (y) any Estate Property liened or transferred by the Debtor to any other Person;

b. Include jurisdiction over the recovery of any Estate Property (or property transferred by the Debtor with Bankruptcy Court approval) from any Person wrongly asserting ownership, possession or control of the same, whether pursuant to Bankruptcy Code sections 542, 543, 549, 550 or otherwise, as well as to punish any violation of the automatic stay under Bankruptcy Code section 362 or any other legal rights of the Debtor or the Estate under or related to the Bankruptcy Code; and

c. Permit the taking of any default judgment against any Person who has submitted himself or herself to the jurisdiction of the Bankruptcy Court.

## V.    POST-EFFECTIVE DATE OPERATIONAL/FINANCIAL INFORMATION

The Debtor believes that the Plan meets the feasibility requirement set forth in Bankruptcy Code section 1129(a)(11), as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtor. In connection with the development

11328289/2

of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the ability of the Reorganized Debtor to satisfy its financial obligations while maintaining sufficient liquidity and capital resources has been examined.

The Plan Sponsor is committed to a successful reorganization of the Debtor. The Plan Sponsor is in the business of acquiring and strengthening software companies, including companies in similar areas of business as the Debtor. The acquisition of the Reorganized Debtor fits within the Plan Sponsor's strategic plan, namely, to operate and continue the business. The Plan Sponsor also values the Debtor's IP portfolio. To that end, the Plan Sponsor has committed to providing the Consideration to acquire the Debtor, through acquisition of the New Equity. The Plan Sponsor believes that under its management, the Reorganized Debtor will enhance its relationships with its customers, while simultaneously engaging in cost-cutting efforts to drive efficiency and profitability. The Plan Sponsor possesses sufficient liquidity and believes that it will be able to leverage its relationships, expertise and know-how to help the Reorganized Debtor thrive. One reason the Debtor filed the Chapter 11 Case was because it lost a key strategic partner, drastically reducing revenue. Through the Plan Sponsor's portfolio of similar technology companies, the Reorganized Debtor will be better positioned to operate successfully moving forward. Accordingly, the Plan Sponsor is confident that the Reorganized Debtor will be feasible going forward, and will not require a further reorganization. Further, no Distributions to Creditors or Interest Holders are dependent on any metrics related to the Reorganized Debtor, such as the Reorganized Debtor's profitability.

## VI.    RISK FACTORS

### A.    Risks Related to Bankruptcy

#### 1.    Parties May Object to the Plan's Classification of Claims and Equity Interests

Bankruptcy Code Section 1122 provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtor believes that the classification of the Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtor created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims or Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2.    The Debtor May Not Be Able to Obtain Confirmation of the Plan

With regard to any proposed plan of reorganization, the Debtor may not receive the requisite acceptances to confirm a plan. In the event that votes from Claims in Classes 2, 3 or 4 are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtor intends to seek confirmation of the Plan by the Bankruptcy Court.

Even if the requisite acceptances of a proposed plan are received, the Bankruptcy Court might not confirm the Plan as proposed if the Bankruptcy Court finds that any of the statutory requirements for confirmation under Bankruptcy Code section 1129 have not been met.

3.      **The Conditions Precedent to the Effective Date of the Plan May Not Occur**

As more fully set forth in the Plan, the Effective Date is subject to certain conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not occur.

4.      **Allowed Claims May Exceed Estimates**

The projected distributions set forth in this Disclosure Statement are based upon, among other things, good faith estimates of the total amounts of Claims that will ultimately be Allowed. The actual amount of Allowed Claims, including Administrative Claims, could be materially greater than anticipated, which will impact the distributions to be made to holders of Claims.

As of the date of this writing, the aggregate total dollar amount of scheduled Priority Unsecured Non-Tax Claims, Convenience Claims, General Unsecured Claims and Noteholder Claims is approximately $13,200,000. The Debtor (and subsequently, the Distribution Trustee) will reconcile filed claims and reserve the right to object or compromise any filed claims on all applicable grounds. Any increase in the aggregate total dollar amount of Priority Unsecured Non-Tax Claims, Convenience Claims, General Unsecured Claims and Noteholder Claims will only reduce the Distributions.

Furthermore, the Debtor and Plan Sponsor are still in the process of determining which executory contracts will be assumed prior to the Confirmation Date.  Under the Plan, Cure amounts in connection with assumed contracts are required to be from the Consideration, which may reduce amounts available for distribution to Creditors.

B.      **Risks Related to Financial Information**

The financial information contained in this Disclosure Statement has not been audited. In preparing this Disclosure Statement, the Debtor relied on financial data derived from the Debtor's books and records and schedules and statements that was available at the time of such preparation. Although the Debtor has used reasonable efforts to assure the accuracy of the financial information provided in this Disclosure Statement  the Debtor is unable to warrant or represent that the financial information contained herein and attached hereto is without inaccuracies.

## VII.    <u>CONFIRMATION OF THE PLAN</u>

A.      **The Confirmation Hearing**

Bankruptcy Code section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on Confirmation of the Plan. Bankruptcy Code Section 1128(b) provides that any party in interest may object to Confirmation of the Plan.

The Bankruptcy Court has scheduled the Confirmation Hearing to commence on _____, 2019 at _:00 _.m. (Eastern Time), before the Honorable Kevin Gross United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, 6th Floor, Wilmington, Delaware 19801. The Confirmation Hearing may be

adjourned from time to time without further notice except for an announcement of the adjourned date made at the Confirmation Hearing or any adjournment thereof.

Objections to Confirmation of the Plan must be filed and served by no later [_____, 2019 at _:00 _.m. (Eastern Time). **Unless objections to Confirmation of the Plan are timely served and filed in compliance with the Disclosure Statement Order, they may not be considered by the Bankruptcy Court**.

### B.      Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan is that the Plan (i) is accepted by all Impaired Classes of Claims or Equity Interests, or, if rejected by an Impaired Class of Claims or Equity Interests, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Impaired Class of Claims or Equity Interests; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims or Equity Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of Bankruptcy Code section 1129. The Debtor believes that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11 of the Bankruptcy Code; (ii) the Debtor has complied or will have complied with all of the necessary requirements of chapter 11 of the Bankruptcy Code; and (iii) the Plan has been proposed in good faith. Specifically, in addition to other applicable requirements, the Debtor believes that the Plan satisfies or will satisfy the following applicable Confirmation requirements of Bankruptcy Code section 1129:

- The Plan complies with the applicable provisions of the Bankruptcy Code.

- The Debtor, as a plan proponent, has complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or promised under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Case, or in connection with the Plan and incident to the Chapter 11 Case, has been disclosed to the Bankruptcy Court, and any such payment: (1) made before the Confirmation of the Plan is reasonable; or (2) is subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

- Either each holder of a Claim in an Impaired Class has accepted the Plan, or will receive or retain under the Plan on account of such Claim or Equity Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtor were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code.

- Each Class of Claims that is entitled to vote on the Plan will have accepted the Plan.

- Except to the extent a different treatment is agreed to, the Plan provides that all Administrative Claims and Allowed Priority Tax Claims will be paid in full on the Effective Date, or as soon thereafter as is reasonably practicable.

- At least one Class of Impaired Claims will have accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in that Class.

- Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto.

- All accrued and unpaid fees of the type described in 28 U.S.C. § 1930, including the fees of the U.S. Trustee, will be paid as of the Effective Date.

### C.    Best Interests of Creditors / Liquidation Analysis

Often called the "best interests of creditors" test, Bankruptcy Code section 1129(a)(7) requires that a Bankruptcy Court find, as a condition to confirmation of a chapter 11 plan, that the plan provides, with respect to each impaired class, that each holder of a claim or an interest in such class either (i) has accepted the plan or (ii) will receive or retain under the plan property of a value that is not less than the amount that such holder would receive or retain if the debtor liquidated under chapter 7 on the Effective Date. To make these findings, the Bankruptcy Court must: (a) estimate the cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Case was converted to a chapter 7 case on the Effective Date and the assets of the Debtor's Estate were liquidated; (b) determine the liquidation distribution that each non-accepting holder of a Claim or an Equity Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare the holder's liquidation distribution to the distribution under the Plan that the holder would receive if the Plan were confirmed and consummated.

As further support, the Debtor has attached hereto as <u>Exhibit B</u> a liquidation analysis prepared by its chief financial officer. Based on the foregoing and the liquidation analysis, the Debtor believes that holders of Claims will receive greater value as of the Effective Date under the Plan than such holders would receive in a chapter 7 liquidation.

### D.    Feasibility

Bankruptcy Code Section 1129(a)(11)  requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor (unless such liquidation or reorganization is proposed in the plan). To determine whether the Plan meets this feasibility requirement, the Debtor and Plan Sponsor have analyzed the ability of the Reorganized Debtor to meet its obligations under the Plan. Further, as discussed in Article V of this Disclosure Statement, the Debtor and Plan Sponsor believe that the Reorganized Debtor will be viable following the Effective Date, and that the Plan therefore meets the feasibility requirements of the Bankruptcy Code. The Debtor shall present further information and evidence regarding feasibility as may be necessary in connection with Confirmation of the Plan. In any event, the Plan contemplates the funding of all Consideration by the Plan Sponsor on the Effective Date, and therefore creditor recoveries are not impacted by the Reorganized Debtor's

post-Effective Date feasibility.

### E.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is deemed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required.

A class is "impaired" unless a plan: (a) leaves unaltered the legal, equitable and contractual rights to which the claim or the interest entitles the holder of such claim or interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest.

Bankruptcy Code Section 1126(c) defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of allowed claims in that class, counting only those claims that actually voted to accept or reject the plan. Thus, a Class of Impaired Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

### F.    Confirmation Without Acceptance by All Impaired Classes

Bankruptcy Code Section 1129(b) allows a Bankruptcy Court to confirm a plan even if all impaired classes have not accepted it, provided that the plan has been accepted by at least one impaired class, determined without including the acceptance of the plan by any insider. Notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown," so long as the plan does not "discriminate unfairly" (as discussed below) and is "fair and equitable" (as discussed below) with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

To the extent that any Impaired Class rejects the Plan or is deemed to have rejected the Plan, to the extent applicable, the Debtor shall request Confirmation of the Plan under Bankruptcy Code section 1129(b). The Debtor reserves the right to alter, amend, modify, revoke, or withdraw the Plan, the Plan Supplement, or any schedule or exhibit, including to amend or modify it to satisfy the requirements of Bankruptcy Code section 1129(b), if necessary, subject to the written approval of the Plan Sponsor.

### 1.    No Unfair Discrimination

The "unfair discrimination" test applies to classes of claims or interests that reject or are deemed to have rejected a plan and that are of equal priority with another class of claims or interests that is receiving different treatment under such plan. The test does not require that the treatment of such classes of claims or interests be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and,

accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class. The Debtor submits that if the Debtor "crams down" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that it does not "discriminate unfairly" against any rejecting Class.

### 2. Fair and Equitable Test

The "fair and equitable" test applies to classes that reject or are deemed to have rejected a plan and are of different priority and status vis-à-vis another class (*e.g.*, secured versus unsecured claims, or unsecured claims versus equity interests), and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class, including interest. As to the rejecting class, the test sets different standards depending upon the type of claims or interests in such rejecting class. The Debtor submits that if the Debtor "crams down" the Plan pursuant to Bankruptcy Code section 1129(b), the Plan is structured such that the applicable "fair and equitable" standards are met.

## VIII.  TAX CONSEQUENCES OF THE PLAN

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR FOREIGN TAX LAWS AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## IX.  CERTAIN SECURITIES LAW MATTERS

### A. In General

As provided in Section 13.4 of the Plan, the Debtor believes that the New Equity in the Reorganized Debtor and the offering and issuance thereof shall be exempt from Section 5 of the Securities Act of 1933, if applicable, and from any state or federal securities laws requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security, and shall otherwise enjoy all exemptions available for Distributions of securities under a plan of reorganization in accordance with all applicable law, including, without limitation, Bankruptcy Code section 1145. As set forth in Section 13.4 of the Plan, if the issuance of the New Equity does not qualify for an exemption under Bankruptcy section 1145, the New Equity shall be issued in a manner, which qualifies for any other available exemption from registration, whether as a private placement under Rule 506 of the Securities Act, Section 4(2) of the Securities Act, and/or the safe harbor provisions promulgated thereunder.

### B. Distribution Trust Related Matters

### 1. Initial Issuance of Beneficial Interests

Unless an exemption is available, the offer and sale of a security generally is subject to registration with the United States Securities and Exchange Commission (the "SEC") under

Section 5 of the Securities Act of 1933, as amended (the "Securities Act"). In the opinion of the Debtor, and based on "no action" letters by the SEC, the Beneficial Interests will not be considered "securities" within the definition of Section 2(11) of the Securities Act and corresponding definitions under state securities laws and regulations ("Blue Sky Laws") because the Beneficial Interests will be uncertificated and non-transferable other than by operation of law. Accordingly, the Beneficial Interests should be issuable in accordance with the Plan without registration under the Securities Act or any Blue Sky Law.

Alternatively, in the event that the Beneficial Interests are deemed to constitute securities, Bankruptcy Code section 1145(a)(1) of the Bankruptcy Code exempts the offer and sale of securities under a plan of reorganization from registration under the Securities Act and Blue Sky Laws if three principal requirements are satisfied:

A.      the securities are offered and sold under a plan of reorganization and are securities of the debtor, of an affiliate of the debtor participating in a joint plan with the debtor, or of a successor to the debtor under the plan;

B.      the recipients of the securities hold a pre-petition or administrative claim against the debtor or an interest in the debtor; and

C.      the securities are issued entirely in exchange for recipient's claim against or interest in the debtor, or principally in such exchange and partly for cash or property.

If and to the extent that the Beneficial Interests may constitute securities, the Debtor believes that these beneficial interests issued in respect of certain Allowed Claims will qualify as securities "of the debtor … or of a successor to the debtor" pursuant to Bankruptcy Code section 1145(a)(1). In addition, the Beneficial Interests will be issued entirely in exchange for such Claims and Equity Interests. Thus, the Debtor believes that the issuance of the Beneficial Interests pursuant to the Plan will satisfy the applicable requirements of Bankruptcy Code section 1145(a)(1), and that such issuance should be exempt from registration under the Securities Act and any applicable Blue Sky Law.

The Debtor believes that their reliance upon the foregoing exemptions in respect of the issuance of the Beneficial Interests is consistent with positions taken by the SEC with respect to similar transactions and arrangements by other chapter 11 trustees. However, the Debtor has not sought any "no-action" letter by the SEC with respect to any such matters, and therefore no assurance can be given regarding the availability of any exemptions from registration with respect to any securities, if any, issued pursuant to the Plan.

## 2.      Resales

The Beneficial Interests will be subject to transfer restrictions under the terms of the Distribution Trust Agreement. As provided in said agreement, generally, the Beneficial Interests cannot be assigned or transferred other than by operation of law, and will not be represented by certificates.

## 3.      Exchange Act Compliance

44

Section 12(g) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), applies only to a company that has both (i) total assets in excess of $10.0 million and (ii) a class of equity securities held of record by more than 2,000 persons or 500 persons who are not accredited investors (within 120 days after the last day of the company's fiscal year). The Debtor believes it unlikely condition (i) will be deemed satisfied in respect to the Distribution Trust and Beneficial Interests, and in any event, the Distribution Trust should not be required to register under Section 12(g) of the Exchange Act. The Debtor understands that the staff of the SEC has issued no-action letters with respect to the non-necessity of Exchange Act registration of a bankruptcy plan trust when the following are true:

> A.    the beneficial interests in the trust are not represented by certificates or, if they are, the certificates bear a legend stating that the certificates are transferable only upon death or by operation of law;

> B.    the trust exists only to effect a liquidation and will terminate within a reasonable period of time; and

> C.    the trust will issue annual unaudited financial information to all beneficiaries.

Based on the foregoing, the Debtor believes that the Distribution Trust will not be subject to registration under the Exchange Act. However, the views of the SEC on the matter have not been sought by the Debtor and, therefore, no assurance can be given regarding this matter.

### 4.    Compliance if Required

Notwithstanding the preceding discussion, if the Distribution Trustee, in relation to the Distribution Trust, determines, with the advice of counsel, that the Distribution Trust is required to comply with the registration and reporting requirements of the Exchange Act, then prior to the registration of the Distribution Trust under the Exchange Act, the Distribution Trustee (subject to the terms of the Distribution Trust Agreement) will seek to amend the Distribution Trust Agreement, to make such changes as are deemed necessary or appropriate to ensure that the Distribution Trust is not subject to registration or reporting requirements of the Exchange Act. The Distribution Trust Agreement, as so amended, will be effective after notice and opportunity for a hearing, and the entry of an order of the Bankruptcy Court.

If the Distribution Trust Agreement, as amended, is not approved by the Bankruptcy Court or the Bankruptcy Court otherwise determines in a Final Order that registration under the Exchange Act (or any other related or similar federal laws) is required, then the Distribution Trustee will take such actions as may be required to satisfy the registration and reporting requirements of the Exchange Act (or any other related or similar federal laws).

## X.    <u>RECOMMENDATION</u>

In the opinion of the Debtor, the Plan is superior and preferable to the alternatives described in this Disclosure Statement. Furthermore, the value being provided to Creditors and Interest Holders under the Plan was obtained through a fulsome marketing process during which parties other than the Plan Sponsor could have provided higher and better bids. Accordingly, the Debtor recommends that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated: October 28, 2019

<div align="center">

Respectfully submitted,

Zumobi, Inc.

Ken Willner

</div>

<div align="center">46</div>

**<u>Exhibit A</u>**

Plan of Reorganization[1]

---

[1] The Plan has been separated filed with the Court, concurrently herewith.

## **Exhibit B**

Liquidation Analysis