UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: ) | |
| ) | Chapter 11 |
| ZUMOBI, INC., ) | |
| ) | Case No. 19-12284(KG) |
| Debtor. ) | |

### DECLARATION OF KEN WILLNER IN SUPPORT OF CONFIRMATION OF THE DEBTOR'S PLAN OF REORGANIZATION

I, Ken Willner, make this declaration (the "Declaration") pursuant to section 1746 of title 28 of the United States Code, and hereby state as follows:

1. I am the Chief Executive Officer and board member of Zumobi, Inc. (the "Debtor"), a corporation organized under the laws of the State of Delaware and the debtor and debtor in possession in the above-captioned chapter 11 case (the "Chapter 11 Case"). My current duties for the Debtor include general supervision of, and, with counsel, responsibility for, the Debtor's bankruptcy case and financial affairs. In my capacities with the Debtor, I have general knowledge of the books and records of the Debtor, and am familiar with the Debtor's financial and operational affairs.

2. Except as otherwise indicated, all statements in this Declaration are based upon my personal knowledge, my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's advisors, or my opinion based on my experience with the Debtor's operations- and financial condition. In making my statements based on my review of the Debtor's books and records, relevant documents and other information prepared or collected by the Debtor's advisors, I have relied upon these advisors accurately recording, preparing or collecting any such documentation and other information. If I were called to testify as a witness in this matter, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion. I am authorized to submit this Declaration on behalf of the Debtor.

3. I am familiar with the Debtor's Plan of Reorganization dated October 28, 2019 (as may be subsequently supplemented or amended, the "Plan") [Docket No. 14], the Disclosure Statement, the Plan Supplement, the requirements for confirmation of the Plan, and the means for the implementation of the Plan. I have also reviewed the Debtor's Memorandum of Law In Support of Confirmation of the Plan (the "Plan Memorandum"), which is being filed with the Bankruptcy Court substantially contemporaneously herewith. Except to the extent any factual assertions are attributed in the Memorandum to another party, I adopt the factual assertions set forth in the Plan Memorandum as my own and such assertions are incorporated herewith as if set forth herein.

### Factual Background

4. I am familiar with my Declaration in Support of the Chapter 11 Petition and First Day Motions (the "First Day Declaration") and incorporate it as if set forth herein. Among other things, and as set forth in the First Day Declaration, the Debtor is a mobile technology company that partners with multiple brands to promote native content marketing solutions on smartphones,

tablets, and other devices in order to address the challenge of providing a more streamlined solution for publishing and consuming content on mobile devices. Founded in September 2006, the company's original product was a mobile browser-based service that aimed to make surfing the web on mobile devices easier using widgets. Between August of 2006 and 2013, the Debtor entered into Series A financing in the approximate amount of $40 million from Oak Investment Partners XII, L.P. and Hunt Ventures Fund I, L.P. (the "Noteholders").

5. Over the years, the Debtor developed core business relationships with many of the key players in the mobile media ecosystem, including major media companies and advertisers. After several years of research and development investment in technical infrastructure, the Debtor achieved profitability in 2015 and was well on its way to building a sustainable mobile the Debtor business, however near the end of 2015, the Debtor lost its primary distribution partner after that company's mobile advertising business was sold to a competitor. This was a financial blow to the Debtor, as that distribution partnership accounted for over 60% of annual revenue that could not be replaced. The Debtor retooled and attempted to rebuild itself by investing its research and development in a new product called Microzines in early 2016. Microzines are content marketing vehicles that enable marketers to deliver their branded content and social media on mobile devices. This new product gained traction and became the primary driver of new customers between late 2016 through 2018. However, in October 2018, the Debtor was notified that the contract of a major partner, Autograph Inc., had been terminated by its only customer. This directly impacted the Debtor as it was a subcontractor of Autograph, and the Debtor lost this entire revenue stream going into 2019. The Debtor's attempts to leverage that business to others in the industry lost momentum with the loss of the Autograph contract.

6. The Debtor had invested significant resources in developing this business, in anticipation of it being a major source of revenue in 2019, and when Autograph's contract was abruptly terminated, the Debtor suffered immediate and unrecoverable operating losses. At the same time, the Debtor's profitability faced headwinds as the ad tech industry was consolidating around the major players in the market, including Google and Facebook, making it even harder for smaller companies like the Debtor to compete. These factors combined to create such a huge negative financial impact that the company could no longer operate independently as a going concern.

7. At the end of 2015, the Debtor had 30 employees. Following the economic issues set forth above, the Debtor attempted to right-size itself. As of December 2018, the Debtor had 13 employees. In December 2018, the Debtor assigned its headquarters to a third party, and leased back 50% of the space, effective August 15, 2019. Additionally, the Debtor terminated the lease of its office space in New York, effective Aug 30, 2019. As 2019 progressed, the Debtor continued to reduce its workforce and by June 2019, the Debtor had seven (7) full time employees, plus two (2) part-time accounting staff. Attempting to stem the loss of employees and keep the Debtor's operations running during this period, the Debtor contacted the Noteholders for financing. The Noteholders provided the Debtor with a series of bridge notes (the "Bridge Notes"), which eventually totaled $8,950,000, excluding interest. After exhausting the final $400,000 draw on the Bridge Notes in April 2019, the Debtor was notified by the Noteholders that the Debtor had depleted all funds available under the Bridge Notes.

8. In light of the uncertainty within the market and its internal issues, in March 2018, the Debtor engaged Inverness Advisors ("Inverness") to market the company, particularly focused on larger organizations with more resources to invest in building the business. Interested parties

were invited to submit letters of intent (a "LOI") to purchase the Debtor or substantially all of the Debtor's assets. The marketing process included the development, in conjunction with the Debtor's management team, of a marketing presentation for potential candidates. Inverness assisted the Debtor in identifying and evaluating candidates for a potential transaction. The Debtor, with the assistance of Inverness, prepared and implemented a marketing plan, and distributed a presentation to interested parties.

9. During this process, through the efforts of Inverness and members of the Debtor's board of directors and executive team, the Debtor contacted more than seventy (70) companies, including both strategic and financial potential purchasers, of which the company met with approximately twenty (20) potential acquirers. After nearly two years of seeking an acquisition, ESW Capital LLC ("ESW Capital") was the only party to submit an offer, and on August 26, 2019, ESW Capital submitted an LOI.

10. After receiving ESW Capital's LOI, the Debtor evaluated its restructuring alternatives and determined in its business judgment to proceed with a transaction with ESW Capital, subject to agreement of a proposed transaction. The Debtor has since negotiated at arms-length an agreement on a restructuring transaction with ESW Capital that addresses the Debtor's capital structure challenges, as memorialized in the RSA (defined below), including providing proposed financing to the Debtor during the Chapter 11 Case.

11. The Debtor negotiated with its Noteholders, many of its vendors, as well as ESW Capital, as plan sponsor to secure support for a consensual restructuring. After extensive negotiations conducted at arm's length, with separate counsel, and in good faith, the Debtor, the Noteholders, and ESW Capital entered into the RSA, by and through which, the Noteholders committed to support the Debtor's restructuring efforts.

12. As set forth in the RSA and Plan, conditioned upon the company going through a Chapter 11 reorganization process, ESW Capital has agreed to acquire 100% of the shares of equity interests of the reorganized Debtor (the "New Equity"), free and clear of any options, liens or other claims through the Plan in consideration for a new cash contribution of $750,000, plus up to another $150,000.

13. The proposed transaction set forth in the RSA and Plan represented a significant achievement for the Debtor. Specifically, it provided a means for the Debtor to reorganize on terms acceptable to the Noteholders who are the Debtor's largest creditors (and investors). Moreover, the RSA permits the Debtor to maintain and grow its valuable business and to maximize its enterprise value on a going-forward basis. By the RSA, the Noteholders agreed to permit all other general unsecured creditors with a thirty percent (30%) recovery prior to the Noteholders receiving any recovery, at which time the Noteholders will share pro rata with the other general unsecured creditors in any remaining Consideration (the "GUC Recovery").

14. Absent this concession by the Noteholders, the GUC Recovery would have been substantially less than they would otherwise receive under the Plan. In fact, absent the agreement of the Debtor, the Noteholders, and ESW Capital, it is likely that the Debtor would have had no choice but to liquidate, in which case, unsecured creditors would have received no meaningful recovery.

15. Based upon the foregoing, I believe that the Plan provides the best recoveries possible for holders of Allowed Claims. The Plan represents a potentially highly successful outcome for this Chapter 11 Case.

**The Terms of the Plan Satisfy Section 1129 of the Bankruptcy Code**

16. Section 1129(a)(1) - <u>Compliance of the Plan with Applicable Provisions of the Bankruptcy Code</u>. As reflected in the Plan, I am informed and, to the best of my knowledge, believe that the Plan complies with all applicable provisions of the Bankruptcy Code. Article III of the Plan specifies all non-classified Claims and their proposed treatment. The Plan designates five Classes of Claims, other than Administrative Claims and Priority Tax Claims. Article III of the Plan identifies Class 1 (Priority Unsecured Non-Tax Claims), Class 2 (Secured Claims), Class 3 (Convenience Claims), Class 4 (General Unsecured Claims), Class 5 (Equity Interests). Each Class of Claims contains only Claims that are substantially similar to the other Claims or Interests within that Class. A reasonable basis exists for the classifications in the Plan, and said classifications were not an attempt to manufacture an impaired class that will vote in favor of the Plan.

17. The Plan also provides the same treatment for each Claim or Interest within a particular Class. The Plan provides adequate means for the Plan's implementation, as set forth in Article VI (Means for Implementation of the Plan), Article VIII (Treatment of Executory Contracts and Unexpired Leases), Sections 13.1 and 13.2 (Conditions Precedent to Confirmation of the Plan and to the Effective Date), and Article X (Effects of Confirmation), among other provisions of the Plan. The Debtor will have sufficient cash available to make all payments that are required to be made on the Effective Date pursuant to the terms of the Plan.

18. With respect to the release, exculpation and injunction provisions set forth in Article XI, in my opinion and to the best of my knowledge, based on consultation with Debtor's counsel, these provisions of the Plan are warranted, necessary, reasonable, and appropriate, and are supported by sufficient consent and consideration under the circumstances of the Plan and the Chapter 11 cases as a whole. Particularly with respect to the releases of the Released Parties set forth in Section 11.4, the Debtor has concluded that there are no viable potential claims and/or causes of action against the Debtor's Released Parties, including Oak Investment Partners XII, L.P. and Hunt Ventures Fund I, L.P. Additionally, the Debtor has determined that the Released Parties have substantially contributed in good faith to the Debtor's bankruptcy efforts and reasonably should be protected from future collateral attacks. Taken together, the releases are reasonable and appropriate based on the Debtor's business judgment.

19. Further, with specific regard to the Debtor's postpetition directors and officers, there is an identity of interests as a result of indemnification obligations, such that a lawsuit commenced by the Debtor (or derivatively on behalf of the Debtor) against such individuals would effectively be a lawsuit against the Debtor's estate.

20. Finally, with respect to the exculpation set forth in Section 11.3, the Debtor has determined that its post-petition officers and directors, in addition to the other Exculpated Parties, have substantially contributed in good faith to the Debtor's bankruptcy efforts and reasonably should be protected from future collateral attacks.

21. Section 1129(a)(2) -<u>Compliance of Plan Proponents with Applicable Provisions of the Bankruptcy Code</u>. To the best of my knowledge, as reflected in the Plan, the Debtor has

4

complied with all applicable provisions of the Bankruptcy Code. I am informed and believe that the solicitation of votes to accept or reject the Plan was (i) in compliance with applicable laws, rules, and regulations governing the adequacy of disclosure in connection with -such solicitation and (ii) solicited to holders of Claims entitled to vote on the Plan, in accordance with the Solicitation Procedures Order.

22. Section 1129(a)(3) -<u>Proposal of Plan in Good Faith</u>. To the best of my knowledge, the Debtor proposed the Plan in good faith and not by any means forbidden by law. The Plan contains only provisions that are consistent with the Bankruptcy Code. The Plan achieves an effective, orderly reorganization of the Debtor's assets through the transaction contemplated by the RSA in a timely manner. In short, the purpose of the Plan is not only consistent with the intended purposes and goals of the Bankruptcy Code: reorganization of the debtor and maximizing the value of the estate for the benefit of creditors.

23. Section 1129(a)(4) - <u>Payments of Administrative Expenses</u>. I understand that the Plan complies with the requirements of Bankruptcy Code section 1129(a)(4) because all payments promised or made by the Debtor for services or costs and expenses in connection with the Plan or this case either must be approved or are subject to approval by the Court.

24. Section 1129(a)(5) -<u>Disclosure of Directors and Officers and Compensation and Consistency with Interests of Creditors and Public Policy</u>. No insider will be employed or retained by the Reorganized Debtor. Also, and as set forth in the Distribution Trust Agreement filed as a supplement to the Plan on November 18, 2019, Gavin/Solmonese LLC will be the Distribution Trustee.

25. Section 1129(a)(6) -<u>Approval of Rate Changes</u>. The Plan does not provide for or contemplate any rate change that would require the approval of any regulatory agency.

26. Section 1129(a)(7) -<u>Best Interests of Creditors and Equity Interest Holders</u>. With respect to each impaired Class of Claims of the Debtor, I am informed and believe that each holder of a Claim or Interest in such Class has accepted the Plan or will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtor were liquidated on the Effective Date under Chapter 7 of the Bankruptcy Code. For the reasons discussed in Article VIII.C of the Disclosure Statement, the best interests of creditors test is satisfied in this case. The Plan is expected to provide a greater recovery for Allowed Claims than would a Chapter 7 liquidation. Additionally, as explained in the Disclosure Statement, in a Chapter 7 case, the value available for satisfaction of Claims in the Debtor would be reduced by the costs, fees and expenses of the liquidation under Chapter 7, which would include disposition expenses, the sliding scale fees and compensation of a Chapter 7 trustee, the fees of his or her counsel and other professionals, and certain other costs arising from conversion of the Chapter 11 case to a case under Chapter 7. The individuals named herein, along with their compensation, were disclosed to the Court and parties in interest in the Plan Supplement.

27. Moreover, the monetization of the Debtor's Estate and distributions to creditors likely would suffer additional delays while the Chapter 7 trustee and his/her professionals take time to get up to speed on the myriad relevant matters to complete the administration of the Estate. Finally, a Chapter 7 liquidation could further delay payments being made to creditors in that, in addition to the reasons described above, Bankruptcy Rule 3002(c) provides that conversion of a Chapter 11 case to Chapter 7 will trigger-anew bar date for filing claims against the Estate. Not

5

only could a chapter liquidation delay distribution to creditors, but it is possible that additional claims that were not asserted in the chapter 11 case, or were late-filed, could be filed against the Estate.

28. Section 1129(a)(8) -<u>Acceptance of the Plan by Each Impaired Class</u>. Because the Plan does not impair Class 1, that Class is deemed to have accepted the Plan and not entitled to vote. Classes 2, 3, and 4, all of which were impaired, unanimously voted in favor of the Plan. Class 5 was deemed to reject the Plan, but, as discussed further below, the Debtor seeks confirmation of the Plan under the cramdown provisions of section 1129(b).

29. Section 1129(a)(9) - <u>Treatment of Claims Entitled to Priority Pursuant to Section 507 of the Bankruptcy Code</u>. The Plan provides for the treatment of Administrative Claims and Priority Tax Claims in a manner that I understand to be required by the Bankruptcy Code.

30. Section 1129(a)(10) - <u>Acceptance by at Least One Impaired Class</u>. As required by section 1129(a)(10) of the Bankruptcy Code, at least one Class of Claims that is impaired under the Plan has accepted the Plan, excluding votes cast by insiders. Specifically, Classes 2 (Convenience Claims) and Class 3 (General Unsecured Claims), and Class 4 (Noteholders) have unanimously accepted the Plan.

31. Section 1129(a)(11) -<u>Feasibility</u>. I believe that this requirement is satisfied by the Plan. The Debtor anticipates that the transaction contemplated by the RSA and as set forth in the Plan will be consummated shortly after approval of the Plan, and no further financial reorganization of the Debtor will be required. The Debtor anticipates having sufficient funds available as of the Effective Date to pay all claims and expenses that are required to be paid on the Effective Date under the Plan (including Administrative Claims and Priority Tax Claims), and to fund the Distribution Trust.

32. Section 1129(a)(12) -<u>Payment of Bankruptcy Fees</u>. The Plan provides at Section 13.13 for the payment of all statutory fees payable to the Office of the United States Trustee on or before the Effective Date. I believe that the Debtor will have adequate means to pay all such fees

33. Section 1129(a)(13) -<u>Retiree Benefits</u>. The Debtor does not currently provide any retiree benefits, as that term is defined in section 1114 of the Bankruptcy Code.

34. Section 1129(a)(14) -<u>Support Obligations</u>. The Debtor is not an individual and it is not required to pay any domestic support obligations.

35. Section 1129(a)(15) -<u>Distribution of Property</u>. The Debtor is not an individual.

36. Section 1129(a)(16) -<u>Transfer of Property</u>. I understand this provision applies with respect to nonprofit corporations and trusts, and that it is not applicable to the Debtor's case.

37. Section 1129(b)(1) - <u>Cramdown</u>. The Plan seeks confirmation pursuant to Section 1129(b) on the basis that the Plan is fair and equitable and does not discriminate unfairly as to holders of Claims in Class 5 (Equity Interests). I am informed and believe that the Plan may be confirmed notwithstanding the rejection of the plan by Class 5, because, as explained in the Memorandum; (i) the Plan does not unfairly discriminate against Class 5, (ii) the Plan is fair and equitable as to Class 5.

38. Section 1129(d) - <u>Tax Avoidance</u>. The principal purpose of the Plan is not avoidance of taxes or avoidance of the requirements of Section. 5 of the Securities Act of 1933.

39. Section 1129(e). <u>Small Business Case</u>. The Plan complies with the requirement of 11 U.S.C. § 1129(e) because it was confirmed no later than forty-five (45) days after the Plan was filed.

40. For the foregoing reasons I submit that the Plan should be confirmed and request that the Court grant the relief requested.

Pursuant to 28 U,S.C, § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct

December 4, 2019                                    ____/s/ Ken Willner_____
                                                    Ken Willner
                                                    Chief Executive Officer and board member of
                                                    Zumobi, Inc.